**In the Matter of TERRY LIMITED PARTNERSHIP, Debtor.**

**Appeal of INVEX HOLDINGS, N.V.**

**No. 93–3371.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 14, 1994.

Decided June 10, 1994.

**242**

Jeffrey E. Kehl (argued), South Bend, IN, for Invex Holdings, N.V., plaintiff-appellant.

Seth D. Linfield, Michael B. Watkins (argued), Barnes & Thornburg, South Bend, IN, for Equitable Life Ins. Co. of Iowa, defendant-appellee.

Before CUMMINGS, BAUER, and COFFEY, Circuit Judges.

BAUER, Circuit Judge.

Following the declared bankruptcy of Terry Limited Partnership ("Terry"), its chief asset, an office building, was sold at a public auction. The sale generated revenue sufficient to repay the first and second mortgage holders. Equitable Life Insurance ("Equitable") was the second mortgage holder. According to Equitable's agreement with Terry, if Terry defaulted, interest would begin to accrue at a higher rate. At issue in this case is whether Equitable is entitled to receive this higher rate of interest for the period following Terry's default. The bankruptcy court awarded Equitable post-default interest at the higher contract rate. Having received nothing and not liking it, Invex Holdings, holder of a third mortgage on Terry's building, contends that Equitable's postdefault interest should only have accrued at the lower predefault rate. The district court affirmed the bankruptcy court's decision. We also affirm.

## I.

In December of 1983, Terry purchased the Society Bank Building, located in South Bend, Indiana, from Invex Finance. In connection with this purchase, Terry entered mortgage agreements (in order of priority) with Roosevelt Savings Bank ("Roosevelt"), Equitable, and Invex Holdings, the parent company of Invex Finance. For purposes of this discussion, only the agreements with Equitable and Invex Holdings are relevant. Terry executed a promissory note to Equitable in the amount of $2.1 million secured by a mortgage on the building. The note was payable at an interest rate of 14¼% per annum and was first due to mature on February 1, 1990. The maturity date was later extended to April 1 of the same year. In the event of default, interest was to accrue at the rate of 17¼% per annum. Invex Holdings's note was payable at the rate of 17¼% and was scheduled to mature in December of 1987.

Terry failed to meet its obligations under either note. In a last ditch effort to survive, Terry filed a proposed reorganization plan under which a third party would loan Terry $3.3 million. Contingent on the loan and the plan being in place by September 1, 1992 and that Terry pay off its obligation to Equitable in full by October 1, 1992, Equitable agreed not to object to the proposed plan and to waive its claim to obligations accruing from December of 1991.

When Terry failed to receive the loan commitment by September 1, 1992, the court ordered that the Society Bank Building be sold at a public auction. Invex Holdings purchased the building for $4,005,001. Roosevelt's and Equitable's claims were repaid from the proceeds of the sale. The interest on Equitable's claim, both before and after default, was calculated at the predefault rate of interest. Equitable objected, contending that interest accrued between the time of Terry's default and the sale of the

property should have been calculated at the higher default rate contained in its agreement. Invex Holdings argued that if the postdefault portion was calculated at the higher default rate, Equitable would be overcompensated.

In ruling that it was reasonable for Equitable to be paid the higher default rate of interest, the bankruptcy court relied on several considerations. First and foremost, the court noted the testimony of Invex Holdings's own expert witness, Donald Schefmeyer, who testified that it was routine for lenders to insist upon a higher default rate of interest because of the unforeseeable costs involved with collecting from debtors in default. According to Schefmeyer, a default rate of interest which exceeds the contract rate of interest by three percent was customary. Schefmeyer also conceded that in light of market conditions during the time of the transaction, the terms of Equitable's mortgage were not unreasonable. Second, the court attached significance to the fact that Invex Holding's contract rate was equivalent to Equitable's default rate. Finally, the court emphasized the importance of enforcing, as close as possible, the parties bargained-for contract rights. When Invex Holdings entered its agreement with Terry, it did so fully aware of Roosevelt's and Equitable's superior interests in the property and the extent of those interests. In short, Invex Holdings bargained for the risky position in which it later found itself, and as the court stated, "There is nothing equitable, however, in diminishing one creditor's bargained for rights in order to augment the rights bargained for by a second creditor." The bankruptcy court ordered that Equitable be awarded postdefault interest at the higher contract rate. On appeal, the district court affirmed.

## II.

We review the bankruptcy court's decision under the same standard as the district court conducts its review. The bankruptcy court's findings of fact are reversible only if that court's findings are clearly erroneous. Bankr.R. 8013. Its conclusions of law, on the other hand, are reviewable *de novo*. *Wood-*

*bridge Place Apts. v. Washington Square Capital, Inc.,* 965 F.2d 1429 (7th Cir.1992).

Crucial to the outcome of this case is the significance of the contract default rate. Section 506 of the Bankruptcy Code provides that a holder of an oversecured claim is entitled to "interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose." 11 U.S.C. § 506(b). The Supreme Court, in *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989), held that while an award of "fees, costs, or charges" is dictated by the loan agreement, the award of interest is not. The Court did not elaborate, however, as to how the interest rate in the agreement should be treated.

Bankruptcy courts have construed *Ron Pair* to require analyzing default rates based on the facts and equities specific to each case. *In re Consolidated Properties Ltd. Partnership,* 152 B.R. 452, 457 (Bankr. D.Md.1993); *In re DWS Invs.,* 121 B.R. 845, 849 (Bankr.C.D.Cal.1990). This does not render the contracted-for default rate irrelevant. "[D]espite its equity pedigree, [bankruptcy] is a procedure for enforcing prebankruptcy entitlements under specified terms and conditions rather than a flight of redistributive fancy." *In re Lapiana,* 909 F.2d 221, 223 (7th Cir.1990). Creditors have a right to bargained-for post-petition interest and "bankruptcy judges are not empowered to dissolve rights in the name of equity." *Id.* at 224. What emerges from the post-*Ron Pair* decisions is a presumption in favor of the contract rate subject to rebuttal based upon equitable considerations. *In re Courtland Estates Corp.,* 144 B.R. 5, 9 (Bankr. D.Mass.1992); *In re Hollstrom,* 133 B.R. 535, 539 (Bankr.D.Colo.1991); *DWS Invs.,* 121 B.R. at 849 (Bankr.C.D.Cal.1990).

Courts have found the presumption to be sufficiently rebutted in cases where the contract rate was significantly higher than the predefault rate without any justification offered for the spread. *Id.* For example, in *Consolidated Properties,* 152 B.R. at 458, the court refused to award interest based on a contract default rate which was thirty-six percent higher than the predefault rate

where the contract already provided that the creditor would be entitled to late fees stemming from the debtor's default. A higher default rate of interest would have in effect enabled the creditor to recover twice for the same losses. In *Hollstrom* and in *DWS Investments,* contract default rates of thirty-six percent and twenty-five percent respectively were rejected because no evidence was presented to show that these rates were common in the market at the time of the transactions. *Hollstrom,* 133 B.R. at 539–40; *DWS Investments,* 121 B.R. at 850.

Conversely, in *Courtland Estates,* the creditor submitted evidence showing that the contract rate of eighteen percent was within the range of default rates charged at the relevant time. After considering the equities of the case, the court awarded the creditor postdefault interest based on the contract rate. *Courtland Estates,* 144 B.R. at 9.

■ In the proceedings below, the bankruptcy judge heard extensive testimony about the purpose of a default rate of interest. Specifically, the evidence established that a default rate is commonly included in mortgage transactions to cover the additional but unforeseeable costs and risks associated with a defaulting borrower. Further, Schefmeyer, Invex Holdings's own expert witness, testified that given interest rates at the time of this transaction, a mortgage such as Equitable's with a predefault interest rate of 14¼% and a default rate of 17¼% was not unreasonable.

The record and the caselaw support the bankruptcy judge's conclusion that Equitable's contract default rate was reasonable. In cases where courts refused to award interest based on the contractual default rates, it was because those rates could not be justified by demonstrated need or by prevailing industry practice. Here, Schefmeyer's testimony confirmed that default rates customarily ranged between 2½% and 4½% over the predefault rate. And while Invex Holdings's mortgage was inherently riskier than Equitable's mortgage, the fact that their own mortgage note was payable at a rate of 17¼% does undermine to some degree the claim that Equitable's default rate was patently unreasonable.

Invex Holdings contends that the decision of the bankruptcy court should be reversed because awarding Equitable the default rate of interest would provide Equitable with double recovery. Because the bankruptcy court permitted Equitable to recover the costs and charges associated with the default as provided for in the promissory note, Invex Holdings argues that the award of default interest was inequitable.

As discussed earlier, a creditor is entitled to an award of "fees, costs, or charges," if the loan agreement provides for such an award and to the extent such an award is reasonable. 11 U.S.C. § 506(b). Equitable's note entitled it to receive appraisal fees and attorneys' fees. This provision fails, however, to compensate Equitable for the unforeseeable costs associated with Terry's default. As Schefmeyer's testimony bears out, a default situation requires a creditor to actively monitor the collateral to ensure that its value is preserved. The costs incurred in performing this task vary from case to case and simply cannot be provided for beforehand. Inclusion of a default rate of interest is designed to address this difficulty. *Consolidated Properties,* 152 B.R. at 457. Recognizing the distinction between the foreseeable and unforeseeable costs of a default, the bankruptcy court correctly determined that the default rate was designed to compensate for losses suffered in addition to those provided for in the agreement.

In its affirmance of the bankruptcy court, the district court noted that Invex Holdings, through Invex Finance, had realized a profit in selling the Society Bank Building to Terry. The district court observed also that in Terry's ill-fated attempt to reorganize, Equitable agreed to compromise its claim by more than $700,000. Invex Holdings contends that these two findings were clearly erroneous and that in relying upon them in its decision, the district court committed reversible error.

We need not pass on the accuracy of these findings because they were immaterial to the district court's conclusion. After reviewing the record and assuring itself that the contract default rate was conscionable and a reasonable means of protecting against the

unforeseeable consequences of a default, the district court held that Equitable should not be deprived of its bargained-for rights in order to bestow upon Invex Holdings benefits in excess of its bargain. Neither Invex Holdings's gain from the sale of the building nor Equitable's stipulation was essential to the district court's decision.

### III.

By extending financing to Terry, Invex Holdings placed itself in a position subordinate to that of Roosevelt and Equitable and in doing so, knowingly took the risk that it would get nothing in the event of a default. Denying Equitable postdefault interest at the contract rate would be tantamount to transferring Invex Holdings's risk to Equitable after the fact. There is nothing equitable about such a redistribution. The decisions of the bankruptcy court and the district court awarding Equitable postdefault interest at the rate provided for in its agreement are

AFFIRMED.