In re ACE–TEXAS, INC., Ace–East, Inc., Ace–U.S., Inc., Ace–South, Inc., Ace–West, Inc., Ace–Central, Inc., and Scott Cable Communications, Inc., Debtors.

Bankruptcy Nos. 96–166 (PJW) to 96–172 (PJW).

United States Bankruptcy Court, D. Delaware.

March 17, 1998.

Laura Davis Jones, Joel A. Waite, Young, Conaway, Stargatt & Taylor, L.L.P., Wilmington, DE, for Debtors.

Larry D. Henin, Gerard S. Catalanello, Baer Marks & Upham L.L.P., New York City, Special Counsel to Debtors.

William H. Sudell, Jr., Derek C. Abbott, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

Charles L. Glerum, Kerry S. Kehoe, Choate, Hall & Stewart, Boston, MA, for CIG & Co., and Metropolitan Life Insurance Company.

## MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

This is the Court's ruling with respect to the limited objection lodged by reorganized debtor Scott Cable Communications, Inc. ("Scott") to the proofs of claim filed by CIG & Co. ("CIG") (Claim No. 92) and successor by merger to New England Mutual Life Insurance Co., Metropolitan Life Insurance Co. ("MetLife") (Claim No. 104). Each proof of claim relates to certain note obligations and requests payment at default rates of interest (two percentage points above pre-default rates) during the course of this Chapter 11 case. Scott objects to the default

rates of interest on the grounds (1) that equitable considerations weigh against the award of interest at the default rates under 11 U.S.C. § 506(b);[1] and (2) that the payment in full of CIG and MetLife on the effective date of the plan of reorganization resulted in a cure of the claims under Code § 1124(2). The Court held an evidentiary hearing on the objection on May 14, 1997, including the testimony of James R. Kuzemchak, a managing director and former investment officer of CIGNA Investments. For the reasons stated below, I will overrule Scott's limited objection to Claim No. 92 and Claim No. 104.

## FACTS

Scott owns and operates cable television systems across ten states. Scott has approximately 76,000 subscribers nationwide, and its cable systems pass approximately 119,000 homes located in Arkansas, California, Texas, Colorado, Louisiana, New Mexico, Ohio, North Dakota, Virginia, and Nebraska. Scott has approximately 120 employees.

CIG and MetLife each entered into note agreements with Scott on June 30, 1993, which amended, extended, and restated the outstanding indebtedness that Scott owed to CIG and MetLife under certain note agreements dated January 19, 1988, and certain senior secured notes issued in connection therewith. The obligation to repay was secured by a first-priority lien on all of Scott's assets, including, but not limited to, Scott's right, title, and interest in all present and future contracts, equipment, accounts, inventory, general intangibles, patents, trademarks, and franchise agreements. Three tranches of senior secured notes relevant to the issue before me are the following:

- Series A Senior Secured Notes due 1995 ("Series A Notes") dated June 30, 1993, in the aggregate principal amount of $25,837,408, which provide for a pre-default interest rate of 11.39% per annum;
- Series C Senior Secured Notes due 1995 ("Series C Notes") dated June 30, 1993, in the aggregate principal amount of $3,586,438, which provide for a pre-de-

fault interest rate of 12.59% per annum; and
- Series D Senior Secured Notes due 1995 ("Series D Notes") (together with Series A Notes and Series C Notes, the "Notes") dated June 30, 1993, in the aggregate principal amount of $8,883,301, which provide for a pre-default interest rate of 11.40% per annum.

Pursuant to the terms of the Notes, from and after maturity, interest on unpaid principal and interest accrues at a default rate that is two percentage points above each pre-default rate (the "2% Differential"). Thus, the default rate for Series A Notes is 13.39%, Series C Notes 14.59%, and Series D Notes 13.40%.

The Notes matured in accordance with their terms on November 15, 1995. Scott was unable to pay the remaining principal amount of the Notes. In order to provide Scott with additional time to explore all available financing alternatives, CIG and MetLife entered into separate agreements with Scott, pursuant to which CIG and MetLife agreed, subject to the satisfaction of certain conditions set forth therein, to refrain from exercising certain of their rights and remedies until February 15, 1996 (the "Standstill Agreements") However, Scott was unable to find a replacement lender or negotiate a restructuring agreement with the holders of other debt before the Standstill Agreements expired, and CIG and MetLife declined to extend the Standstill Agreements.

On February 14, 1996 (the "Petition Date"), Scott, along with its six shareholders (together with Scott, the "Debtors"), filed voluntary petitions for relief under Chapter 11 of the Code. The cases were consolidated for administrative purposes only. Pursuant to Code §§ 1107(a) and 1108, the Debtors continued to operate their businesses and manage their assets as debtors in possession.

As of the Petition Date, CIG held $6,153,332 in aggregate principal amount of Series A Notes and $4,425,674 in aggregate principal amount of Series D Notes. Also as of that date, MetLife held $3,918,960 in aggregate principal amount of Series A Notes and

---

**1.** Hereinafter, I shall refer to Title 11 of the    United States Code as the "Code."

$1,836,466 in aggregate principal amount of Series C Notes.

Shortly following the Petition Date, Scott, CIG, MetLife, and certain other secured lenders entered into a cash collateral stipulation (the "Cash Collateral Stipulation"), providing for Scott's use of cash collateral from the Petition Date through and including December 31, 1996. Pursuant to the Cash Collateral Stipulation, the Debtors agreed (a) that as of the Petition Date $23,110,765 in principal and $114,271 in accrued and unpaid interest was due and owing by Scott to holders of senior secured debt, including the Notes, (b) that the payment of that debt was not subject to any offset, defense, claim, or counterclaim, (c) that the liens securing the obligations of Scott to the holders of the Notes were valid, enforceable, and perfected, and (d) that the holders of the Notes were oversecured. The $114,271 accrued and unpaid interest consisted only of default-rate interest on senior secured notes, because Scott paid interest at the pre-default rates through the Petition Date.

As adequate protection for the use of cash collateral, Scott granted CIG and MetLife replacement liens on all of Scott's after-acquired property, assets, rights, and the like. Scott agreed to pay CIG and MetLife monthly interest in arrears under the Notes at the pre-default rates, as well as attorneys' fees and disbursements for services rendered; the Debtors, CIG, and MetLife reserved their respective rights under the stipulation regarding Scott's obligation to pay the 2% Differential. The Court approved the Cash Collateral Stipulation on March 7, 1996, and it remained in place until the plan of reorganization became effective on December 18, 1996 (the "Effective Date").

On December 6, 1996 (the "Confirmation Date"), less than ten months after the commencement of the case, the Court entered an order confirming the Debtors' Second Amended Joint Plan of Reorganization, as modified (the "Plan"). Article V of the Plan classified CIG's and MetLife's Note claims as impaired. The Debtors reserved the right to assert that these claims were unimpaired.

On the Effective Date, Scott effected the consummation of the Plan by closing on a $67.5 million post-confirmation credit facility (the "Finova Loan") with FINOVA Capital Corp. ("Finova"). Scott used the proceeds from the Finova Loan primarily to satisfy certain classes of indebtedness. In addition to administrative and priority tax claims, the Plan provided for distributions to eight classes of claims:

1. Class 1, priority claims, received cash payments in full.

2. Class 2 consisted of secured claims other than claims in Classes 3 and 4. At the option of Scott, holders of allowed Class 2 claims either (a) were left unaltered in their legal, equitable, and contractual rights; (b) had their claims cured pursuant to Code § 1124(2); (c) received a cash payment for their secured claims with any deficiency claims treated as Class 8 claims; or (d) received a return of their collateral in full satisfaction of the secured claims with any deficiency claims treated as Class 8 claims.

3. Class 3 consisted of the Notes, among other senior secured claims. Holders received cash in the full amount of the allowed claims in the approximate amount of $32 million. Scott established a reserve in the amount of the portions of claims that were in dispute. CIG and MetLife, with partially disputed claims, are members of this class.

4. Class 4 consisted of secured claims of holders of senior secured subordinated note documents. Holders received cash in the amount of the allowed claims in the approximate amount of $19.7 million. As in Class 3, the Plan provided for a reserve.

5. Class 5 consisted of unsecured claims of holders of zero coupon subordinated note documents. Holders received full satisfaction in cash in the approximate amount of $13.3 million.

6. Class 6 consisted of unsecured claims of holders of public subordinated debentures. Each holder thereof received its ratable share of cash for principal and interest, its ratable share of a refinancing fee, a negotiable certificate representing each holder's ratable share of its undivided interest in new restructured second secured 15% PIK notes in the principal amount of $49.5 million and

all of the new Class C common stock, and a negotiable certificate representing each holder's ratable share of its undivided interest in 15% of new restructured third secured 16% PIK notes in the principal amount of $38.9 million. According to Scott, this package represented a 100% payout.

7. Class 7 consisted of unsecured claims of the holders of junior subordinated notes. Each holder received a negotiable certificate representing each holder's ratable share of its undivided interest in 85% of the new restructured third secured 16% PIK notes in the principal amount of $38.9 million and its ratable share of all of the new Class B common stock. According to Scott, this represented a payout of 85%.

8. Class 8 consisted of trade and unsecured claims other than claims in Classes 5 through 7. Holders received cash in the full amount of the allowed claims in the approximate amount of $1.2 million.

All sharehold interests were cancelled.

Pursuant to Class 3 treatment, CIG received $10,691,583, which amount represented principal in the amount of $10,579,006 and accrued interest in the amount of $112,577. MetLife received $5,817,763, which amount represented principal in the amount of $5,755,426 and accrued interest in the amount of $62,337. In addition, CIG and MetLife's attorneys received $105,600 for legal fees and expenses.

The Plan payment did not include the default rates of interest, the 2% Differential, claimed by CIG and MetLife. Consequently, pending the Court's determination of this dispute, pursuant to the Confirmation Order, Scott established the escrow of funds (i) for CIG in the aggregate amount of $251,550 and (ii) for MetLife in the aggregate amount of $135,450, which amounts represent the 2% Differential between the pre-default rates of interest and default rates of interest during the Chapter 11 case together with estimated interest at the default rates for three years and attorneys' fees.

## DISCUSSION

The matter before me is one that has been addressed by a number of bankruptcy courts: the right of an oversecured creditor to receive default-rate interest. Because the issue involves a facts and circumstances assessment, the reported decisions go both ways.

■ Code § 506(b) entitles the holder of an oversecured claim to interest on its claim. *See United States v. Ron Pair Enters.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989).[2] *Ron Pair*, however, did not address the issue of what rate of interest is applied under Code § 506(b). *See, e.g., Bradford v. Crozier (In re Laymon)*, 958 F.2d 72, 74 (5th Cir.1992). To determine the proper interest rate, courts employ a presumption in favor of the contractual rate of interest subject to rebuttal based upon the equitable considerations specific to each case. *See, e.g., In re Terry L.P.*, 27 F.3d 241, 243 (7th Cir.1994) (awarding contractual default rate of interest). "A rebuttable presumption clearly is a rule of evidence which has the effect of shifting the burden of proof...." *Heiner v. Donnan*, 285 U.S. 312, 329, 52 S.Ct. 358, 362, 76 L.Ed. 772 (1932) (citing *Mobile, Jackson & Kan. City R.R. v. Turnipseed*, 219 U.S. 35, 43, 31 S.Ct. 136, 138, 55 L.Ed. 78 (1910)). The presumption favors CIG and MetLife. Thus, Scott must prove that the equities weigh in favor of its objection.

■ I find that Scott has not carried its burden. It offered no affirmative testimony to support its objection. Instead, Scott conducted only cross-examination of Mr. Kuzemchak, the claimants' witness. Moreover, its arguments based on the facts alleged in its objection do not convince me that equitable considerations mandate disregard for the contractual default rates.

I find the 2% Differential reasonable and appropriate under the circumstances. "The

---

2. Code § 506(b) provides that

[t]o the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided under the agreement under which such claim arose.

default rate falls well within the range of interest rates which the court has seen in other cases in recent years and is not significantly higher than the non-default rate." *Sugarcreek Window & Door Corp. v. NBD Bank (In re Sugarcreek Window & Door Corp.),* No. 95–60810, 1996 WL 374116, at *3 (June 13, 1996 N.D.Ohio).

Courts have accepted default rates of interest that are three points higher than the pre-default rates. *See In re Terry L.P.,* 27 F.3d at 244 ("[G]iven interest rates at the time of this transaction, a mortgage . . . with a predefault interest rate of [14.25]% and a default rate of [17.25]% was not unreasonable."); *In re Sugarcreek Window & Door Corp.,* at *1 (allowing interest at default rate of [5.25]% over bank's prime rate where non-default rate was [2.25]% over bank's prime rate). One court has even endorsed a default rate 4.3 points above the non-default rate. *See Connecticut Gen. Life Ins. Co. v. Schaumburg Hotel Owner L.P. (In re Schaumburg Hotel Owner L.P.),* 97 B.R. 943, 951 (Bankr.N.D.Ill.1989) (finding that default rate of 19%, compared to non-default rate of 14.7%, does not "fall outside the range of default rates applied commercially, nor does it shock the conscience of the Court"). The 2% Differential falls comfortably inside this range. In addition, the default rates of 13.39%, 14.59%, and 13.40% are not much higher than the pre-default rates.

I might have a different view if the default rates of interest were exorbitant. *See, e.g., Foss v. Boardwalk Partners (In re Boardwalk Partners),* 171 B.R. 87, 92 (Bankr. D.Ariz.1994) (denying default rate of interest of 26% where "risk has been amply compensated by an 18% interest rate which, in April of 1992, was far above the market for fully secured first mortgage loans on apartment houses in the greater Phoenix area"); *In re Hollstrom,* 133 B.R. 535, 539 (Bankr.D.Colo. 1991) (Chapter 7) (noting that 36% default rate "seems excessive"). The Notes here do not provide for such exorbitant rates.

Scott argues that I should compare the default rates of interest to an alleged market rate represented by the exit financing provided by Finova. Pursuant to the Finova Loan, which closed on the Effective Date,

Finova made available to Scott the aggregate sum of $67.5 million to replace, *inter alia,* the obligations to CIG and MetLife. This credit facility provides for quarterly payments of interest at the base rate of Citibank, N.A., as of April 22, 1997, 8 .50%, plus 1.25% or 1.50% per annum depending on Scott's leverage ratio. Scott remarks that not only is the Finova Loan's rate lower than even the Notes' pre-default rates, but the Finova Loan is less oversecured.

■ However, I do not believe that the circumstances in which the Finova Loan was effected are comparable to those in which the Notes were executed. The relevant time is the time of the transaction involving the Notes. *See In re Terry L.P.,* 27 F.3d at 244. The rate of interest of the Finova Loan on the Effective Date is far removed from both 1988 and 1993, no matter which date is construed to be the time of the Notes' transaction. Scott has not offered evidence of a market rate in 1988 or 1993. Even though on cross-examination Mr. Kuzemchak was only able to testify as to the default-rate differentials in a number of transactions in 1988, not 1993, it was not incumbent upon him, CIG, or MetLife to justify the contractual rates. Rather, Scott had the burden to show that the default rates of interest were *not* as they are presumed to be. Furthermore, the Court can take judicial notice of the fact that interest rates generally have been falling since the early 1990s. Consequently, Scott's reference to the Finova Loan is inapposite. In this regard, I also observe that while the Notes were substantially oversecured on the Petition Date, there is nothing in the record to show what the Scott enterprise risk factors were when the Note transaction was first effected in 1988 or redone in 1993.

Scott claims that there was never a risk of non-payment because CIG's and MetLife's claims were oversecured by a 4:1 ratio, so if there were a liquidation, they would have been paid in full. Scott also notes that the Cash Collateral Stipulation provided for monthly interest payments at the pre-default rates, while under the Notes CIG and MetLife received quarterly interest payments.

Mr. Kuzemchak pointed out, however, that CIG and MetLife primarily bargained for repayment of the Notes according to their terms, not through liquidation. Indeed, it took almost four years for CIG and MetLife to realize the benefit of their bargains, not including the 2% Differential. The Notes were issued in 1988. They matured but were not paid in 1993, when they had to be amended and restated because they could not be refinanced. Yet again, they matured but were not paid in 1995. CIG and MetLife acceded to the Standstill Agreements with Scott, but just before their expiration, Scott filed its Chapter 11 petition. The risk of non-payment obviously cannot be disregarded where on two different maturity dates the Notes went unpaid.

▮ I do not believe that the degree to which the claims are oversecured is controlling. Code § 506(b) allows interest to holders of oversecured claims on their claims, regardless of the loan to collateral ratio. In addition, the payment of monthly rather than quarterly interest during the Chapter 11 case provided insubstantial value during the ten-month post-petition period. As one element of the Cash Collateral Stipulation, I do not attach much value to it.

Scott contends that because CIG and Met-Life were paid "in full" approximately ten months after the Petition Date, they have demonstrated no loss that must be compensated, and the 2% Differential constitutes an impermissible penalty. On cross-examination, Mr. Kuzemchak conceded, "I cannot put my finger on a specific cost." (Tr. at 78.) But this testimony does not rebut the presumption in favor of the contractual default rates of interest, because it does not affirmatively show that there were no costs. Default rates are designed to compensate for unforeseeable costs associated with default.

*See In re Terry L.P.*, 27 F.3d at 244. Again, Scott has not carried its burden.[3]

Scott asserts that unsecured creditors will be hurt if CIG and MetLife succeed in their claims to the 2% Differential. However, the unsecured creditors have received everything the Plan set aside for them: cash, PIK notes, and stock. The 2% Differential is not material to the question of what distribution is possible to the unsecured creditors of this debtor, because the Plan has been confirmed and the unsecured creditors have received their distribution. The situation here is unlike that in *In re W.S. Sheppley & Co.*, 62 B.R. 271, 272 (Bankr.N.D.Iowa 1986), relied upon by Scott, where "[t]he differential will be crucial to the question of what distribution may be possible to a junior lienholder and the unsecured creditors. . . ." Still, Scott argues that reducing the amount of interest allowed would return about $400,000 now in escrow to the estate for the benefit of these unsecured creditors/new equity holders. I am not persuaded by this argument, "as any reduction in the allowed secured claim[s] of [CIG and MetLife] will inure to the benefit of the estate. The existence of such a benefit in and of itself does not justify altering the terms of a contract into which [Scott] and [CIG and MetLife] freely entered." *See In re Sugarcreek Window & Door Corp.*, at *3. Scott has not argued that payment of the default interest will affect its business viability. Given the three-year escrow of the default amount of interest, it could hardly make that argument.

Finally, Scott asserts that CIG and Met-Life acted to obstruct its reorganization. According to Scott, CIG and MetLife

(i) opposed Scott's retention of Donaldson, Lufkin & Jenretter ("DLJ"), Scott's financial advisors, which firm was responsible

---

**3.** Scott cites cases that require a claimant to account for its unforeseeable, uncompensated costs. *See, e.g., In re Casa Blanca Project Lenders, L.P. v. City Commerce Bank (In re Casa Blanca Project Lenders, L.P.)*, 196 B.R. 140, 148 (9th Cir. BAP 1996). In my view this approach disregards the nature of the presumption in favor of the contractual default rate of interest. Why establish a presumption that the favored party must reinforce before the debtor even attempts rebuttal evidence? The burden of rebuttal is on Scott. Moreover, Mr. Kuzemchak testified that the 2% Differential "represents the increased yield that is required for the additional risk that is inherent in the fact that you haven't been paid on time and the risk associated with ultimately getting paid in a timely fashion." (Tr. at 70.) He did not testify that the 2% Differential "was designed to induce payment." *See In re Timberline Property Dev., Inc.*, 136 E.R. 382, 386 (Bankr.D.N.J.1992). Thus, the presumption is undisturbed. *See id.*

for arranging the Finova Loan enabling Scott to pay [CIG and MetLife] and certain other creditors on the effective date of the Plan, in cash, in the full amount of their allowed claims; (ii) were the only creditors in the chapter 11 case to oppose every extension of exclusivity sought by Scott even after Finova issued its firm commitment to provide the required financing to fund the Plan; (iii) sought on several occasions to terminate Scott's exclusivity for the purpose of filing an alternate plan of reorganization . . .; (iv) objected to the adequacy of Scott's disclosure statement; and (v) were the only creditors in the chapter 11 case to appear and object to confirmation of the Plan.

(Scott Mem. at 9–10.)

In support of finding that this alleged activity weighs against allowing the 2% Differential, Scott primarily relies again on *In re W.S. Sheppley & Co.*, 62 B.R. at 279. In that case, the plan was still pending as of May 30, 1986, and "the delay from September of 1984 to date in reaching a plan hearing [had] been due in part to unnecessarily obstructive tactics by [the oversecured creditor] in opposing just about every motion put forward by the debtor." *See id.*

*In re W.S. Sheppley & Co.* is factually inapposite. Here the Plan was confirmed in only ten months, whereas in *In re W.S. Sheppley & Co.*, there had not been a confirmation hearing after approximately double that time. Moreover, I believe that the activities described by Scott are not unusual or in any way improper for holders of oversecured claims. The application of a broad-brush approach—whereby opposition to the debtor's initiatives in court equals obstruction that should be penalized by disallowing default-rate interest—would place creditors on the horns of a dilemma in pursuing their rights.

Having balanced the equities, I hold that CIG and MetLife are entitled to the 2% Differential. Scott has not rebutted the presumption in favor of the contract rates.

■ I also hold that Code § 1124(2) does not apply to this case because the Notes were not accelerated. The Notes held by

CIG and MetLife matured pre-petition. Code § 1124(2) provides:

> Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—
>
> . . .
>
> (2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—
>
> (A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title;
>
> (B) reinstates the maturity of such claim or interest as such maturity existed before such default;
>
> (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and
>
> (D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Code § 1124. No part of this section refers to the type of claim held by CIG and MetLife: debt that matured pre-petition.

The plain language of Code § 1124(2) unimpairs claims based on debt that was accelerated upon default, as long as the debtor satisfies the four conditions (A) through (D). CIG and MetLife never accelerated the Notes. Rather, the Notes matured according to their own terms. Even if I were to ignore the obvious language about acceleration, the four conditions—each of which must be satisfied, for they are joined by the conjunction "and"—are directed toward accelerated, not matured debt. To take just one example, it makes no sense to reinstate the maturity of a claim that has already matured. Therefore, Code § 1124(2) cannot serve to unimpair CIG's and MetLife's claims.

Notwithstanding its plain meaning, Scott argues that the acceleration language of Code § 1124(2) does not limit the scope of a cure. Scott relies mainly on *Great Western Bank & Trust v. Entz–White Lumber & Supply, Inc. (In re Entz–White Lumber & Supply, Inc.),* 850 F.2d 1338 (9th Cir.1988). Even though the claim in that case matured pre-petition,

> by curing the default, Entz–White [was] entitled to avoid all consequences of the default—including higher post-default interest rates.... While it is true that most cases in this area have involved a default resulting in acceleration, none of which we are aware have treated acceleration as the only consequence of a default.

*Id.* at 1342 (citing, e.g., *In re Taddeo,* 685 F.2d 24, 26 (2d Cir.1982)). The Ninth Circuit believed that "plans may cure all defaults [except for certain types of defaults enumerated in the statute] without impairing the creditor's claim, and that such defaults include, but are not limited to, those defaults resulting in acceleration." 850 F.2d at 1341 (footnote omitted) (citing, e.g., R. Broude, *Reorganizations under Chapter 11 of the Bankruptcy Code* § 10.02[2], at 10–7 (1987)).

The Ninth Circuit interpreted the legislative history as broadening the language of Code § 1124, because it is not contrary to the acceleration language. *See* 850 F.2d at 1341 (citing *American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982)). "It shows only that the drafters in the Senate were concerned primarily with defaults resulting in acceleration; it does not show that they meant to confine the section to that situation." *Id.*

I decline to adopt this view. The Senate Report states "that 'a claim or interest is unimpaired by curing the effect of a default and reinstating the original terms of an obligation when maturity was brought on or accelerated by the default.'" *Id.* (quoting S.Rep. No. 95–989, 95th Cong., 2d Sess. 120 (1978), U.S.C.C.A.N. 1978, pp. 5787, 5906). The legislative history refers to maturity after a default, whether termed an acceleration or not. It actually supports a finding that there was no cure available for CIG's and MetLife's claims, because Scott's defaults oc-curred after maturity; maturity was not triggered by default.

I side with the author of this view:

> [*In re Entz–White Lumber & Supply, Inc.*] appears to be in error. Section 1124(2) applies only to the curing of defaults that have accelerated the debt. There was no issue of cure before the court in *Entz–White.* The entire debt was due without acceleration. The impairment rule applicable to unaccelerated debt should therefore apply. Under that rule, impairment can be avoided only if the plan proposes cash payment in the full amount of the claim in accordance with the parties' agreement. When the agreement requires a higher postdefault rate of interest, this means the higher rate must be paid. Any other treatment would alter the creditor's rights.

James F. Queenan, Jr., *Chapter 11 Theory & Practice* § 30.15, at 30:49 (1994).

### CONCLUSION

For the foregoing reasons, I overrule Scott's limited objection, and I allow Claim No. 92 and Claim No. 104 as being entitled to the contract default interest rates, the 2% Differential, from the Petition Date through the Effective Date.