In re LIBERTY WAREHOUSE AS-
SOCIATES LIMITED PART-
NERSHIP, Debtor.

Bankruptcy No. 96 B 43704(JLG).

United States Bankruptcy Court,
S.D. New York.

May 18, 1998.

Zivyak, Klein & Liss, New York City, for 64 Liberty Associates.

Parker Chapin Flatteau & Klimpl, LLP, New York City, for Debtor.

### *MEMORANDUM DECISION ON SE-CURED CREDITOR 64 LIBERTY AS-SOCIATES' MOTION FOR POST–PE-TITION DEFAULT RATE INTEREST*

JAMES L. GARRITY, Jr., Bankruptcy Judge.

This motion requires us to determine whether the reorganization plan of Liberty Warehouse Associates, L.P. ("debtor"), a solvent debtor, that proposes to pay the over-secured claim of 64 Liberty Associates ("Associates") in full on its effective date with post-petition interest calculated at a pre-default interest rate fixed in the underlying loan agreement impairs that claim. Debtor argues that under § 506(b) of the Bankruptcy Code, it need only pay interest at the loan's pre-default rate because it is reinstating the indebtedness pursuant to § 1124(2) of the Bankruptcy Code. Associates disputes that position. We find that pursuant to §§ 506(b) and 1124(2), debtor must pay Associates post-petition interest at the default rate of interest stated in the loan agreement.

#### *Facts*

The underlying facts are not in dispute. On or about July 11, 1996, debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Debtor is a limited partnership whose sole asset is a building located on West 64th and 65th Streets in New York City (the "Building"). Associates holds a second mortgage on the Building as security for a loan (the "Associates Loan") in the principal amount of $1,100,000. That loan matured by its terms on June 1, 1996 (the "Loan Maturity Date"). Debtor failed to satisfy any portion of the loan and is in default thereunder. The loan's stated non-default and default interest rates are 14% and 22.8%, respectively.

Debtor has substantial equity in the Building. Pursuant to its confirmed plan of reorganization (the "Plan"), debtor sold the Building and will distribute the sale proceeds in full payment, with interest, of all allowed secured and unsecured claims. The balance of the proceeds will be paid to debtor's limited partners. The Plan classifies Associates as its sole Class 3 creditor and states, in part, that Associates

> shall receive in cash on the Effective Date $1,100,000 as payment in full of the outstanding principal indebtedness, plus payment in full of pre-petition default rate interest from [the Loan Maturity Date] to [the Filing Date], plus payment in full of post-petition interest to the Effective Date or the date such Claim becomes an Allowed Claim, whichever later occurs, as determined by the Bankruptcy Court pursuant to Section 506(b) of the Bankruptcy Code, plus attorneys' fees as agreed by the parties or awarded by the Court ....

Plan ¶ 5.3. It provides that Class 3 is unimpaired. Thus, the Plan tenders for our resolution the issue of what interest rate will apply to the Associates Loan after the Filing Date but prior to the Plan's effective date.

Debtor contends that it need only pay non-default rate interest on Associates' over-secured claim because pursuant to § 1124(2) of the Bankruptcy Code, the Plan cures any and all of its defaults under the Associates Loan, thereby avoiding the accrual of default rate interest. It also contends that as a matter of equity and reasonableness we should not allow default rate interest. Associates denies that the Plan cures debtor's default under its loan pursuant to § 1124(2) and contends that under § 506(b), debtor must pay it default rate interest. Debtor will have sufficient funds to pay the interest due Associates under either scenario and has agreed to do so.

#### *Discussion*

We base our subject matter jurisdiction of this contested matter on 28 U.S.C.

§§ 1334(b) and 157(a) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This is a core proceeding. *See* 28 U.S.C. §§ 157(b)(2)(B) and (L).

■ The Bankruptcy Code provides for three categories of interest: (1) interest accrued prior to the filing of the bankruptcy petition; (2) interest accrued after the filing of a petition but prior to the reorganization plan's effective date i.e. "pendency interest"; and (3) interest to accrue under the reorganization plan. *See Key Bank Nat'l Ass'n v. Milham (In re Milham)*, 141 F.3d 420, 422–23 (2d Cir.1998). Here, we determine the appropriate amount of pendency interest payable under the Plan to Associates on account of its allowed oversecured claim.

In relevant part, § 1124 of the Bankruptcy Code states that

[A] class of claims ... is impaired under a plan unless, with respect to each claim ... of such class, the plan—

\* \* \* \* \* \*

(2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim ... to demand or receive accelerated payment of such claim ... after the occurrence of the default—

(A) cures any default that occurred before or after the commencement of the case under [title 11] ....

(B) reinstates the maturity of such claim or interest as such maturity existed before such default

(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and

(D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

11 U.S.C. § 1124(2); *see also* 11 U.S.C. § 1123(a)(5)(G) (a chapter 11 plan shall "provide adequate means for the plan's implementation, such as ... curing or waiving of any default").

■ The Bankruptcy Code does not define "cure". The court in *DiPierro v. Taddeo (In re Taddeo)*, 685 F.2d 24 (2d Cir.1982), explained that the concept of "curing a default" under the Bankruptcy Code "means taking care of the triggering event and returning to pre-default conditions." *Id.* at 26–27. Accordingly, when a debtor cures a default, "the consequences [of the default] are ... nullified." *Id.* Under § 1124(2), a debtor can cure its pre-petition default under a note or other debt instrument. When it does so it need only pay pendency interest at the non-default rate stated in the underlying agreement. It need not pay interest at the default rate. *See, e.g., Levy v. Forest Hills Associates (In re Forest Hills Associates)*, 40 B.R. 410, 415 (Bankr.S.D.N.Y.1984).

Debtor contends that pursuant to § 1124(2), it can cure its pre-petition default under the Associates Loan, and thereby leave Associates' claim unimpaired by its Plan, by paying the Associates Loan in full, with pendency interest calculated at the non-default rate of 14%, plus reasonable attorneys' fees as awarded by the court. As support, it cites *Great Western Bank & Trust v. Entz–White Lumber and Supply, Inc. (In re Entz–White Lumber and Supply, Inc.)*, 850 F.2d 1338 (9th Cir.1988), and *In re Johnson*, 184 B.R. 570 (Bankr.Minn.1995). In *Entz–White*, the debtor and its lender entered into a loan agreement specifying default and non-default rates of interest. The debtor defaulted under the loan by failing to pay it on its maturity date. Thereafter, it filed a chapter 11 petition. 850 F.2d at 1339. The debtor's plan of reorganization proposed to leave the creditor's claim unimpaired by paying the principal amount of the claim in full with pendency interest calculated at the non-default rate. The creditor objected and argued that the plan impaired its claim because it was entitled to be paid pendency interest at the default rate. *Id.*

The bankruptcy court overruled the objection and confirmed the plan, finding that the "cure" nullified any consequences of the default, including a higher post-maturity interest rate. *Id.* at 1340. The district court

affirmed, and was in turn affirmed by the Ninth Circuit. *Id.* In affirming the district court, the Ninth Circuit noted that while § 1123(a) employs the phrase "any default", § 1124(2) speaks in terms of "a default", and concluded that a plain reading of those provisions evinces an intention by Congress to provide a cure for any default, not just a default resulting from an acceleration clause. *Id.* at 1341. Moreover, it read the legislative history of § 1124 to mean that while Congress was primarily concerned with defaults resulting from acceleration clauses, it did not intend to limit § 1124(2) to those kinds of defaults. *See id.* (citing S.Rep. No. 95–989, 120 (1978)). The court found that the debtor's plan effected a "cure" pursuant to § 1124(2) by paying the creditor in full on confirmation, plus pendency interest at the non-default rate. Consequently, the creditor was not entitled to the default rate of interest. *Id.* at 1338.

In *Johnson,* the court adopted the *Entz–White* court's rationale and held that a debtor need not pay pendency interest at the default interest rate stated in the matured note of the Prudential Insurance Company ("Prudential"), an oversecured creditor. 184 B.R. at 574. The court emphasized that § 506(b) of the Bankruptcy Code vests it with discretion to fix the appropriate rate of pendency interest on an oversecured claim. It found the following factors to be relevant in making that determination:

(1) the difference between the default and non-default rates;

(2) the reasonableness in the rate differential;

(3) the relative distribution rights of other creditors, and whether enforcement of the higher rate will do injustice to the concept of equitable distribution of the estate's assets; and

(4) the purpose of the higher interest rate (*i.e.* whether it was designed to compensate the creditor for loss or a disguised penalty).

*Id.* at 573. In light of the 2% differential between the default and non-default interest rates under the note and the fact that unsecured creditors would be paid the same

whether Prudential's claim accrued default or non-default rate interest, the court concluded that if it were to assess Prudential's entitlement to default interest solely according to this test, it would find that allowance of the default rate was not inequitable. *Id.* at 573. However, because debtor's reorganization plan proposed to "cure" the default pursuant to § 1124(2), the court rejected Prudential's assertion that it be paid default rate interest:

Under the terms of the Plan, Debtor has paid Prudential the full amount of the matured principal, all prepetition interest and charges at the default rate (with the exception of the interest that accrued prior to December 1, 1991—the date of the default), as well as postpetition interest on that debt at the nondefault rate. This payment returned the parties to the status quo ante as of the petition date, and is therefore a true cure. Because the payment under the Plan is a full cure, it nullifies all consequences of the default, and accordingly Prudential is unable to be accrue interest postpetition at the default rate. Whether the debt matured by its own terms or was accelerated and deaccelerated is irrelevant to the analysis. Moreover, the equities mandate that the nondefault rate be enforced. Prudential has not suffered, but has been amply made whole up through the petition date as it received everything provided for in the Note, including interest at the default rate. Prudential is getting the full benefit of its bargain.

*Id.* at 574–75.

Contrary to *Entz–White* and *Johnson,* we read the plain language of § 1124(2) to apply where a debtor seeks to cure a default under an accelerated obligation and reinstate its original terms, but not where the underlying claim has matured by its own terms. In *In re Ace–Texas, Inc.,* 217 B.R. 719 (Bankr.D.Del.1998), the court read the statute in the same way. In that case, the debtor and two creditors entered into two separate loan agreements which provided for different pre and post-default interest rates. The creditors' loans matured pre-petition, and debtor failed to pay them. *Id.* at 721. The debtor's plan proposed to pay those

creditors in full at confirmation, together with pendency period interest at the non-default rate. Noting that "court's employ a presumption in favor of the contractual rate of interest subject to rebuttal based upon the equitable considerations specific to each case", the court found that the debtor had not carried its burden of proving that the equities weighed in favor of its objection. *Id.* at 723. It found that the 2% differential between the default and non-default interest rate was "reasonable and appropriate under the circumstances" and that it fell within the range of interest rates which have been approved by other courts. *Id.* at 723–24. It rejected the debtor's contention that the default rate was excessive because there was never any risk that the creditors would not be paid since their claims were vastly oversecured, stating that " § 506(b) allows interest to holders of oversecured claims on their claims, regardless of the loan to collateral values." *Id.* at 725.

Finally, the court held that § 1124(2) did not apply because the debt matured pre-petition. In doing so, it reasoned that the statute speaks of accelerated payment of a claim. *Id.* It also noted that the statute's plain language provides that all four conditions stated in § 1124(2)(A)-(D) must be satisfied to render a class of claims unimpaired, and "[t]o take just one example, it makes no sense to reinstate the maturity of a claim that has already matured." *Id.* Additionally, it concluded that *Entz–White* incorrectly interpreted the legislative history of § 1124, reasoning that "whether termed an acceleration or not", the legislative history refers to a claim that matured as the result of a default and that a claim that matures by its own terms pre-petition, does not mature as a result of a default, and consequently, cannot be cured pursuant to section 1124(2). *Id.* at 727. The court held that the debtor could not "cure" the default because the notes matured pre-petition by their own terms, and therefore creditors were entitled to post-petition interest at the default rate. *Id.*

▮▮▮▮ Debtor cannot "cure" the default of the Associates' Loan pursuant to § 1124(2) because the loan matured pre-petition. *Id.; see also United States Trust Co. of New York*

*v. LTV Steel Co. (In re Chateaugay)*, 150 B.R. 529, 543 (Bankr.S.D.N.Y.1993) ("[A]ny 'reinstatement' under section 1124(2) can do no more than reinstate an obligation's original maturity date. Although the passing of the alleged maturity date of the [bonds] during the pendency of one of the longest and most complex bankruptcy proceedings ever filed is somewhat of a fortuitous event, section 1124(2) only allows the Debtors to return the accelerated claim to the original maturity date"), *aff'd*, 170 B.R. 551 (S.D.N.Y.1994); *see generally* James F. Queenan, Jr., Chapter 11 Theory and Practice: A Guide to Reorganization § 30.15 at 30:49 (1994) (concluding that *Entz–White* is in error, and that section 1124(2) was intended to "cure" only defaults resulting from acceleration clauses). It does not necessarily follow, however, that Associates' claim must accrue pendency interest at the default rate. Section 506(b) of the Bankruptcy Code states:

> To the extent that an allowed secured claim is secured by property, the value of which, after any recovery under [11 U.S.C. § 506(c) ], is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b). Thus, pursuant to § 506(b), an over-secured creditor is entitled to pendency interest on its claim. *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *United Savings Ass'n. v. Timbers of Inwood Forest*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). As our court of appeals recently noted, "[t]he appropriate rate of pendency interest is … within the limited discretion of the court". *See Milham*, 141 F.3d at 423 (citing *In re DeMaggio*, 175 B.R. 144, 148 (Bankr.D.N.H.1994)). There is "a presumption in favor of the contract rate subject to rebuttal based on equitable considerations." *In re Terry Limited Partnership*, 27 F.3d 241, 243 (7th Cir.1994) (citations omitted), *cert. denied sub nom. Invex Holdings, N.V. v. Equitable Life Ins. Co. of Iowa*, 513 U.S. 948, 115 S.Ct. 360, 130 L.Ed.2d 313 (1994); *see also Milham*, 141 F.3d at 423

("Most courts have awarded pendency interest at the contractual rate; but nevertheless, however widespread the practice may be, it does not reflect an entitlement to interest at the contractual rate"); *Bradford v. Crozier (In re Laymon)*, 958 F.2d 72, 75 (5th Cir.) ("rate of interest [chargeable under § 506(b)] should be determined 'by examining the equities involved in the bankruptcy proceeding'"), *cert. denied*, 506 U.S. 917, 113 S.Ct. 328, 121 L.Ed.2d 247 (1992).

Debtor contends that the equities of this case mandate that we deny Associates' claim for default rate interest because Associates (i) has never been at risk of non-payment, owing to its substantial equity cushion, (ii) has received monthly adequate protection payments since the Filing Date at the 14% non-default interest rate, and (iii) refused an offer in May of 1997 to be paid in full. As support, debtor cites *In re DWS Investments, Inc.*, 121 B.R. 845 (Bankr.C.D.Cal. 1990).

■ Contrary to debtor's assertion, the record does not reflect that Associates refused an offer by a third party to purchase its note. Even if Associates did so, debtor has not demonstrated why that would be grounds for denying it the interest it bargained for under its loan agreement. We disagree that the fact that Associates received adequate protection payments at the 14% non-default interest rate favors debtor's position. Associates did not waive its right to claim default rate interest or otherwise limit its right to do so. Likewise, we find no merit to debtor's "equity cushion" argument. Associates is entitled to accrue pendency interest on its claim because it is oversecured. *In re Ace–Texas, Inc.*, 217 B.R. at 725.

In *DWS Investments, Inc.*, the debtor, in attempting to confirm its reorganization plan, objected to the payment of default interest at the 25% rate specified in its loan agreement with an oversecured pension trust. The court applied its broad discretion and refused to allow pendency interest on the claim at the default rate:

> Usually, the court should apply the contract rate, but it has the power to apply a different rate depending upon equitable considerations. Claimants ask me to accept a default interest rate of 25%. This seems excessive. Claimants offer no evidence to justify this rate other than it is the rate that they use for other transactions. I have no evidence that this rate approximates the market rate for similar loans with borrowers in similar circumstances at the time of the default. The estate is insolvent and the unsecured creditors are unlikely to receive a distribution unless the Plan is confirmed. In order for the Plan to consummate, substantial funding is required from the principals. Furthermore, under California law, I question whether this rate would be legal.

121 B.R. at 849. Here, debtor is solvent. It will pay the allowed claims of unsecured creditors in full, with interest, irrespective of whether it pays Associates pendency interest at the default or non-default rate under its loan. This distinguishes our case from *DWS Investments* and favors permitting Associates to collect default rate interest on its over-secured loan. *See, e.g., In re Ace–Texas*, 217 B.R. 719; *Johnson*, 184 B.R. at 573; *Fischer Enterprises, Inc. v. Geremia (In re Kalian)*, 178 B.R. 308, 316 (Bankr.D.R.I. 1995); *see also In re Vest Associates*, 217 B.R. 696, 703–04 (Bankr.S.D.N.Y.1998) (oversecured creditors' claim for default interest at 15% denied, subject to renewal should chapter 11 debtor prove to be solvent, where although differential of 5% was reasonable, neither party introduced evidence on issue of solvency, creditors had no expenses in monitoring debtor's default because it went into default just prior to filing and creditors stood to recover additional $10,000 in enhanced interest to potential detriment of junior creditors if debtor turned out to be insolvent). Moreover, debtor does not contend that the default interest rate payable under the Associates Loan is illegal, and it does not appear that it is. *See* N.Y. PENAL LAW § 190.40 (McKinney 1997) ("A person is guilty of criminal usury in the second degree when, not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent

rate for a longer or shorter period"); *see also Bruce v. Martin*, 845 F.Supp. 146 (S.D.N.Y. 1994) (default rate of 24.9% is allowable under Penal Law § 190.40 and is not usurious). Thus, many of the factors that prompted the *DWS Investments* court to disallow default rate interest are missing here.

Finally, we are satisfied that the default rate interest is not a disguised penalty. Absent contrary evidence, a default interest rate that is inordinately high relative to the non-default rate will be found to be a penalty. *See, e.g., In re Hollstrom, D.C.*, 133 B.R. 535, 539–40 (Bankr.D.Colo.1991) (36% default rate of interest deemed penalty where non-default rate was 12% and there was no evidence to justify default rate); *In re White*, 88 B.R. 498, 511 (Bankr.D.Mass.1988) (48% default rate of interest was deemed penalty where non-default rate of interest was 16.5% and default rate was unreasonable and grossly disproportionate to damages incurred by breach). Neither party adduced legal or factual support regarding whether the default interest rate is unreasonable or unconscionable. However, the 22.8% default rate under the Associates Loan is not as high as those found to be a penalty in *Hollstrom, White, Foss v. Boardwalk Partners (In re Boardwalk Partners)*, 171 B.R. 87, 92–93 (Bankr. D.Ariz.1994) (24% default rate of interest deemed penalty), or *DWS Investments*, 121 B.R. at 849 (25% default rate of interest deemed a penalty); *see also Kalian*, 178 B.R. at 316–17 (36% default rate deemed "unreasonable" charge ). Further, the spread between the non-default and default rates of interest (*i.e.* 8.8%) is smaller than the differential present in most cases where courts have found the default rate to constitute a penalty. *See, e.g., Kalian*, 178 B.R. at 309 (18% spread); *Boardwalk Partners*, 171 B.R. at 92 (14.5% differential);[1] *Hollstrom*, 133 B.R. at 537 n. 3–4 (24% spread); *DWS Investments*, 121 B.R. at 849 (9–10% differential); *White*, 88 B.R. at 499 (35% spread). *But see In re Boulders on the River, Inc.*, 169 B.R. 969, 975 (Bankr.D.Or.1994) (disallowing claim for default interest at rate 5% higher than contract rate where court was not "persuaded that the default rate of interest constitutes anything but a mere penalty").

### Conclusion

We award Associates pendency interest on its over-secured claim at the default interest rate called for under the Associates Loan.

SETTLE ORDER.

---

**1.** The court in *Boardwalk Partners* also disallowed another secured creditor's claim for default interest at the rate of 26% where the contract rate was 18%, "no serious attempt" had been made by the creditor to justify the default rate as "anything other than a contractual sledgehammer" against the debtor, and the increased interest would have been payable from funds otherwise available for distribution to unsecured creditors, who were not being paid in full. *See* 171 B.R. at 92. Those factors are not present here.