**ORDERED PUBLISHED**

FILED

MAR 31 2016

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

# UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP No. NV-14-1564-KiDJu |
| BELTWAY ONE DEVELOPMENT GROUP, LLC, | Bk. No. 2:11-bk-21026-MKN |
| Debtor. | |
| WELLS FARGO BANK, N.A., | |
| Appellant, | |
| v. | **O P I N I O N** |
| BELTWAY ONE DEVELOPMENT GROUP, LLC, | |
| Appellee. | |

Argued and Submitted on February 18, 2016,
at Las Vegas, Nevada

March 31, 2016

Appeal from the United States Bankruptcy Court
for the District of Nevada

Honorable Mike K. Nakagawa, Chief Bankruptcy Judge, Presiding

Appearances:     Bryce A. Suzuki of Bryan Cave LLP argued for appellant Wells Fargo Bank, N.A.; Gerald M. Gordon of Garman Turner Gordon LLP argued for appellee Beltway One Development Group, LLC.

Before:  KIRSCHER, DUNN and JURY, Bankruptcy Judges.

KIRSCHER, Bankruptcy Judge:

Creditor Wells Fargo Bank, N.A., appeals the bankruptcy court's decision to deny accrued postpetition, pre-effective date[1] default interest on Wells Fargo's allowed, oversecured claim pursuant to the Debtor's chapter 11[2] plan of reorganization, which did not cure the prebankruptcy default. We REVERSE and REMAND.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

**A. Events leading to the bankruptcy case**

Chapter 11 debtor, Beltway One Development Group, LLC, owns and operates the Desert Canyon Business Park, a 15-acre master planned business park located in Las Vegas. Debtor is managed by Beltway One Management Group, LLC, which in turn is managed by Todd Nigro.

On May 16, 2008, Debtor and Wells Fargo's predecessor in interest, Wachovia Bank, N.A., entered into a term loan agreement

---

[1] The postpetition, pre-effective date interest rate determined under § 506(b) commences on the petition date and continues until the effective date stated in the confirmed plan, after which the cramdown interest rate, determined under § 1129, commences if the plan is confirmed. Unless the plan provides a specific date when it becomes effective, the effective date is the confirmation date. See Countrywide Home Loans, Inc. v. Hoopai (In re Hoopai), 581 F.3d 1090, 1101 (9th Cir. 2009) (although a chapter 13 case, discussion on effective date is applicable under § 1325(a)(5)(B)(ii) and § 1129(b)(2)(A)(i)(II)). In this appeal we refer to this postpetition, pre-effective date interest rate as "pendency interest." This pendency interest may be the prepetition contractual interest rate or the contractual default interest rate depending on whether a cure or a noncure occurs in the pending case and depending on what interest rate is provided in any contractual provisions. The cramdown interest rate or "plan interest" is not an issue on appeal.

[2] Unless specified otherwise, all chapter, code and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

-2-

wherein Wachovia agreed to lend Debtor $10 million. In exchange for the loan, Debtor executed a promissory note, a deed of trust with assignment of rents and other documents in favor of Wachovia, giving the lender a first position lien and security interest in the real property and various personal property of Debtor.[3] The note matured on May 16, 2011, before the bankruptcy petition was filed.

Per the terms of the agreement, the loan accrued interest at a variable rate equal to 1-month LIBOR rate plus 2.10%. Upon default, the interest rate would increase by 3% over the nondefault rate of LIBOR plus 2.10%.[4]

In May 2010, Wells Fargo issued notices of default based on an alleged loan-to-value ratio covenant default. Specifically, Wells Fargo claimed the value of the property was $10.15 million and therefore, in order to comply with the covenant requiring a LTV ratio of not less than 70%, demanded that Debtor immediately tender a payment of $2,793,419 to reduce the loan balance to $7.105 million. Debtor was unable to meet the demand and tried to negotiate a resolution, which the parties failed to accomplish.

Debtor did not pay the loan in full by its maturity date of May 16, 2011. Wells Fargo sent Debtor and the loan guarantors a letter declaring Debtor's default and the acceleration of the

---

[3] Specifically, Wells Fargo's loan is secured by, among other things, one building in the Desert Canyon complex known as "Building 11."

[4] The 30-day LIBOR rate was 2.48% when the note was executed in May 2008, resulting in an interest rate of 4.58%. The loan's nondefault interest rate has not exceeded 3.4% since January 2009, and remained at 2.4% throughout the bankruptcy case. Accordingly, the default rate was 5.4% throughout the bankruptcy case.

debt, including the principal balance of $9,789,494.72 and accrued interest of $18,011.56, for a total due of $9,807,506.28. On July 8, 2011, Wells Fargo recorded its Notice of Trustee's Sale and advised Debtor it would be filing a complaint and seeking the appointment of a receiver. To avoid foreclosure, Debtor filed its chapter 11 bankruptcy petition on July 13, 2011.

**B.    Debtor's bankruptcy case**

Pursuant to a stipulated cash collateral agreement, Debtor paid Wells Fargo monthly adequate protection payments of $30,000. Debtor timely made each of these payments between July 2011 and the Effective Date of Debtor's chapter 11 plan.

Meanwhile, Wells Fargo filed its proof of claim on November 15, 2011, asserting a prepetition debt of $9,877,741.20, which consisted of $9,789,494.72 in unpaid principal, $36,060.70 in unpaid accrued nondefault interest, $47,315.89 in default interest, and $4,869.89 in other charges.

**1.    Debtor's plan and Wells Fargo's objection**

In Debtor's amended chapter 11 plan of reorganization (the "Plan"), for Wells Fargo's claim Debtor proposed to:  (1) extend the loan term to March 31, 2017, with a balloon payment at the end of the Plan term; (2) impose a cramdown interest rate of 4.25%; (3) and eliminate various covenants (one being the LTV covenant) and other loan terms.  Debtor would make a $200,000 payment to Wells Fargo just after the Plan's Effective Date, and thereafter make monthly payments for principal and interest (at the 4.25% rate), amortized over 30 years.

The Plan expressly provided that Wells Fargo would "not be entitled to any default interest, late fees, or other charges

-4-

resulting from a default occurring prior to the Effective Date." The Plan further provided that on the Effective Date, any pre-Effective Date defaults under the Wells Fargo loan would be deemed to have been "cured."

In support of the Plan, Debtor offered a direct testimony declaration from Mr. Nigro. He testified that even if Wells Fargo's claim were allowed as filed, including default interest, Debtor would still have more than $2 million in equity at the new maturity of the restructured loan under the Plan.

In opposing confirmation, Wells Fargo contended the Plan failed the general "fair and equitable" test under § 1129(b)(1) because it treated Wells Fargo as fully secured but deprived Wells Fargo of its contractual right to default interest, late fees and other charges arising from any default prior to the Effective Date. Citing Future Media Productions, Inc.,[5] Wells Fargo contended that as an oversecured creditor, § 506(b) authorized recovery of postpetition default interest on its claim and any reasonable fees, costs or charges arising under the loan agreement. Wells Fargo further contended that Debtor's proposed "cure" attempt was not permissible; Debtor could not "magically cure" the maturity date default as required by § 1124(2)(A).

**2.    The Plan confirmation hearing and post-trial briefing**

Following the four day Plan confirmation hearing, the parties filed post-trial briefs. Reiterating the same arguments it had raised in its Plan objection and citing Future Media, Wells Fargo

---

[5] Gen. Elec. Capital Corp. v. Future Media Prods., Inc., 536 F.3d 969, 973 (9th Cir.), amended 547 F.3d 956, 960 (9th Cir. 2008).

-5-

contended that Debtor's Plan failed the general "fair and equitable" test under § 1129(b) by depriving it of default interest prior to the Effective Date despite the loan documents' allowance for such charges and that § 506(b) provided oversecured creditors like Wells Fargo recovery of any pendency interest.

Debtor acknowledged the Plan was not "curing" the Wells Fargo loan and not restoring its formerly effective terms; rather, it was creating a "new loan" by restructuring the debt. Debtor did not generally disagree with the authority cited by Wells Fargo for the payment of default interest, late fees and other charges. The only caveat, according to Debtor, was that § 506 did "not allow any such interest to exceed the value of the collateral."

**3.    The bankruptcy court confirms the Plan.**

With the Plan under submission for just over two years, the bankruptcy court entered its Order and Memorandum Decision on Final Approval of Disclosure Statement and Confirmation of Chapter 11 Plan on March 25, 2014. The court adopted Debtor's valuation of $11.1 million for Building 11, which secured Wells Fargo's claim of approximately $9.9 million, and approved the cramdown interest rate of 4.25%.[6] In denying Wells Fargo pendency interest, the court's ruling was brief:

> Modification of default interest rates and elimination of late fees and other costs is consistent with the Code and supported by the case cited by Wells Fargo. In [Future Media], the Ninth confirmed its previous holding in Great Western Bank & Trust v. Entz-White Lumber and

---

[6] The bankruptcy court's valuation of Building 11 at $11.1 million is not disputed on appeal. Therefore, it is undisputed that Wells Fargo is an oversecured creditor. See United States v. Ron Pair Enters., Inc., 489 U.S. 235, 239 (1989) (a creditor is considered to be "oversecured" when the value of its collateral exceeds the amount of the creditor's allowed claim).

-6-

Supply, Inc. (In re Entz-White Lumber and Supply, Inc.), 850 F.2d 1338 (9th Cir. 1988), "that an oversecured creditor was not entitled to interest at the default rate where its claim was paid in full pursuant to the terms of a Chapter 11 plan." 536 F.3d at 973. The circuit panel went on to emphasize that "the provision allowing 'cures' under § 1124(2)(A) 'authorizes a plan to nullify all consequences of default, including avoidance of default penalties such as higher interest.'" Id., citing Fla. Partners Corp. v. Southeast Co. (In re Southeast Co.), 868 F.2d 335, 338 (9th Cir. 1989).

Based on the foregoing, Section 1129(b) is satisfied.

Mem. Decision (Mar. 25, 2014) 15:3-14.

### 4. Wells Fargo's motion to reconsider the Confirmation Order

Wells Fargo moved to alter or amend judgment or for relief from judgment respecting the Confirmation Order ("Motion to Reconsider"). In short, Wells Fargo contended the Confirmation Order had to be amended (1) to clarify that Entz-White and its progeny were inapplicable in this case and (2) to require the payment of postpetition default interest, charges, fees and expenses as part of Wells Fargo's allowed claim under § 506(b).

Wells Fargo argued that because its claim was impaired and the Plan did not effect a "cure" within the meaning of Entz-White or § 1124(2)(A) allowing Debtor to eliminate Wells Fargo's right to default interest, Wells Fargo could not be deprived of its default interest recoverable under § 506(b) as an oversecured creditor as set forth in Future Media. In other words, the bankruptcy court was required under Future Media to enforce the contractual default rate as to its pendency interest. Alternatively, Wells Fargo argued that even if the Plan could be interpreted to effect an Entz-White cure, the 1994 amendments to

-7-

the Code, namely § 1123(d), overturned Entz-White and its progeny, and thus such "cures" eliminating default interest and other charges available in the underlying agreement and applicable nonbankruptcy law were no longer valid.

In opposition to the Motion to Reconsider, Debtor conceded that no Entz-White cure was effected or even contemplated for Wells Fargo's claim under the Plan. Nonetheless, argued Debtor, regardless of whether or not the Plan cured Wells Fargo's claim, the bankruptcy court was permitted to disallow default interest under its equitable discretion and the authority granted it by Future Media. Debtor contended that under Future Media the allowance of default interest is subject to equitable considerations, which is consistent with the holding in Entz-White that bankruptcy courts have "broad equitable discretion" in awarding postpetition interest. Debtor contended Entz-White was still good law despite the enactment of § 1123(d).

In reply, Wells Fargo argued that nowhere in its Memorandum Decision did the bankruptcy court discuss equitable considerations or any other basis for eliminating default interest other than a "cure." However, if the bankruptcy court did rely on equitable considerations to eliminate default interest, the Memorandum Decision required amendment to articulate those considerations. In any event, Wells Fargo contended that the "equities" in this case clearly supported the enforcement of the parties' contractual default interest provisions. The default rate was a mere 3% higher than the nondefault rate, which remained at 2.4% throughout the bankruptcy case. Thus, Debtor had enjoyed an extraordinary low interest rate for the length of the case, thereby allowing it

-8-

to stockpile over $2 million in cash. Eliminating Wells Fargo's claim for default interest allowed Debtors' owners to reap substantial equity in the property and over $2 million in cash at the expense of Wells Fargo. Even after paying its claim for default interest of $752,948.72, Wells Fargo argued that Debtor would still be left with more than $2.4 million of equity, which was hardly an inequitable result.

### 5. The bankruptcy court's ruling on the Motion to Reconsider

In its order denying the Motion to Reconsider, the bankruptcy court's analysis was again brief. The court first noted that in approving the Plan, it had reached the legal conclusion that the treatment of Wells Fargo's claim was fair and equitable within the meaning of § 1129(b)(1), and "[n]othing in the parties' dispute over the continued vitality of Entz-White change[d] this result." Order on Motion to Reconsider (Nov. 17, 2014) 6:5-6. The court concluded that Entz-White was still good law, but even if it were not, "its holding is not inconsistent with and is instructive in the determination of whether a particular plan treatment is fair and equitable to an objecting creditor."[7] Id. at 7:11-14.

Wells Fargo timely appealed.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(L). We have jurisdiction under 28 U.S.C. § 158(b).

///

---

[7] Wells Fargo had also requested amendment to require Debtor to include fees and expenses as part of Wells Fargo's claim. The bankruptcy court ultimately allowed Wells Fargo's professional fees and expenses of $166,850 as part of its oversecured claim.

-9-

## III. ISSUE

Did the bankruptcy court err in eliminating the prepetition default interest rate as the pendency interest for Wells Fargo's oversecured claim?

## IV. STANDARD OF REVIEW

When the denial of a claim for default interest is based on statutory interpretation, a question of law, our review is de novo. CityBank v. Udhus (In re Udhus), 218 B.R. 513, 515 (9th Cir. BAP 1998).

## V. DISCUSSION

Three categories of interest exist in bankruptcy cases: (1) interest accrued prior to the filing of the bankruptcy petition (prepetition interest); (2) interest accrued after the filing of a petition but prior to the effective date of a reorganization plan (pendency interest); and (3) interest to accrue under the terms of a reorganization plan (plan interest). Key Bank Nat'l Ass'n v. Milham (In re Milham), 141 F.3d 420, 423 (2d Cir.), cert. denied, 525 U.S. 872 (1998). The category of interest at issue in this appeal is pendency interest.

Generally, the Code does not provide for pendency interest to creditors, because the filing of the petition usually stops interest from accruing. Id. Section 506(b), however, provides an exception for oversecured creditors:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

-10-

§ 506(b). Thus, an oversecured creditor can recover pendency interest as part of its allowed claim, at least to the extent it is oversecured. Rake v. Wade, 508 U.S. 464, 471 (1993), superseded on other grounds by §§ 1123(d) and 1322(e); Ron Pair Enters., Inc., 489 U.S. at 241; In re Hoopai, 581 F.3d at 1099-1101 (pendency period includes from the petition date to the date of plan confirmation as opposed to the "effective date," unless the plan specifically provides an effective date). Any accumulated pendency interest determined under § 506(b) is added to the allowed claim of an oversecured creditor and then paid pursuant to the terms of the confirmed plan with plan interest determined under § 1129(b)(2)(A)(i)(II). See 4 COLLIER ON BANKRUPTCY ¶ 506.04[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2016).

The issue before us is a narrow one: whether the bankruptcy court was required to apply the default rate of interest to Wells Fargo's claim during the pendency period. While § 506(b) entitles an oversecured creditor to recover pendency interest on its claim, the statute does not specify the rate of interest to be applied. Ron Pair held that a creditor's entitlement to interest is not dependent upon an agreement or contract between the parties, but it did not address the question of the rate of interest to which a creditor is entitled when an agreement exists. Arguably, this Panel and the Ninth Circuit Court of Appeals have weighed in on this issue.

**A. Entz-White is inapplicable.**

In the Ninth Circuit case, Entz-White, the chapter 11 debtor, pursuant to a plan and upon confirmation, paid the oversecured

-11-

creditor the full principal balance owed and accrued interest at the contract rate (the pre-default rate of prime plus 1.5%) under the promissory note, which matured prepetition. The debtor argued that by paying the arrearage on the creditor's obligation, it had cured the default under § 1124 and, thus, the plan could treat the creditor's claim as unimpaired under § 1124(2)(A) and eliminate the consequences of default. The creditor objected to confirmation because the plan did not allow for its claim of default interest (a rate of 18%). The creditor contended the § 1123(a)(5)(G)[8] "cure" of the debtor's default did not relieve the debtor from paying default interest on the matured note. 850 F.2d at 1339-40.

The Ninth Circuit rejected the creditor's argument. Recognizing the Code does not define "cure," the court adopted the definition of "cure" adopted by the Second Circuit in Di Pierro v. Taddeo (In re Taddeo), 685 F.2d 24 (2d Cir. 1982), that "[a] default is an event in the debtor-creditor relationship which triggers certain consequences . . . . Curing a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified. This is the concept of 'cure' used throughout the Bankruptcy Code." Entz-White, 850 F.2d at 1340 (quoting In re Taddeo, 685 F.2d at 26-27). The court reasoned that "curing" a default returns the parties to pre-default conditions, as if the default had never occurred. Accordingly, because the oversecured

---

[8] Section 1123(a)(5)(G) provides: "Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall provide adequate means for the plan's implementation, such as curing or waiving of any default."

-12-

creditor's claim was paid in full immediately on the plan's effective date and "cured," the debtor was "entitled to avoid all consequences of the default – including higher post-default interest rates." Id. at 1342.

In denying default interest under § 506(b), the Ninth Circuit stated that the more "natural reading" of §§ 506 and 1124 is that "the interest awarded should be at the market rate or at the pre-default rate provided for in the contract." Id. at 1343. Despite this apparent bright-line rule of no default interest in the case of a complete cure, the court stated in a footnote: "We continue, of course, to recognize bankruptcy courts' 'broad equitable discretion' in awarding post-petition interest." Id. at 1343 n.9 (citing Bank of Honolulu v. Anderson (In re Anderson), 833 F.2d 834, 836 (9th Cir. 1987)).

Wells Fargo argues, and Debtor has conceded, that no "cure" within the meaning of Entz-White occurred here. Wells Fargo's claim was expressly impaired and the Plan did not provide for the immediate payment of the outstanding indebtedness to Wells Fargo upon confirmation, as was the case in Entz-White. Rather, under the Plan, the original maturity date of the note was extended for an additional five years; a new amortization schedule was implemented; and new terms were substituted in lieu of the prior obligation. Because Debtor's Plan did not cure the default under the Wells Fargo note, Entz-White is inapplicable. Accordingly, to the extent the bankruptcy court relied upon Entz-White to deny Wells Fargo any pendency interest at the default rate on the basis that the prepetition default was "cured" pursuant to the terms of the Debtor's Chapter 11 plan, it erred.

-13-

Debtor contends that even if no Entz-White cure occurred here, the bankruptcy court still had authority to modify the default interest under its "broad equitable discretion" as recognized in Entz-White, which the bankruptcy court appropriately employed under § 1129(b)'s "fair and equitable" requirement. The bankruptcy court did not "modify" the default rate; it eliminated it, applying instead the pre-default rate. In its brief analysis, the bankruptcy court did seem to employ the "fair and equitable" standard for plan confirmation as a basis for denying default interest under § 506(b). It appears to have done the same thing in ruling on the Motion to Reconsider. Perhaps this is because Wells Fargo had argued repeatedly that the Plan was not fair and equitable due to Debtor's treatment of Wells Fargo's claim in not paying default interest.

In any event, to the extent the bankruptcy court utilized the "fair and equitable" test under § 1129(b) to deny default interest under § 506(b), it erred. Determining pendency interest to be included as part of an allowed secured claim as of the date of confirmation under § 506(b) is an issue separate and distinct from the fair and equitable test for plan confirmation under § 1129(b). Essentially, application of the default rate to pendency interest is a claims issue. The "fair and equitable" test under § 1129(b) is a plan issue and concerns only the treatment of the allowed claim after confirmation. Therefore, the bankruptcy court erred in conflating the fair and equitable standard of § 1129(b) with the elimination of pendency default interest under § 506(b).

Finally, we agree with Wells Fargo and interpret the footnote in Entz-White regarding the court's "broad equitable discretion"

-14-

in awarding postpetition interest as being limited to the very narrow circumstance of a plan which cures and nullifies all consequences of default but fails to establish the appropriate postpetition interest rate under the contract or applicable state law. That is not the case here.[9]

## B. **Hassen Imports**

In a case presenting facts similar to those here, this Panel held that when the debt is not being cured within the meaning of Entz-White, the oversecured creditor is entitled to default interest that reasonably compensates it for losses arising from the default. Hassen Imps. P'ship v. KWP Fin. VI (In re Hassen Imps. P'ship), 256 B.R. 916, 924-25 (9th Cir. BAP 2000), superseded by § 506(b) (2005). In other words, entitlement to contractual default interest is not automatic but may be allowed upon demonstrating that it meets certain requirements. Id. at 924.

The Panel in Hassen Imports reviewed decisions from other circuits, which presume reasonableness of contractual default interest unless the debtor introduces evidence in rebuttal. In re Hassen Imps. P'ship, 256 B.R. at 924 (citing Southland Corp. v. Toronto-Dominion (In re Southland Corp.), 160 F.3d 1054 (5th Cir. 1998) (default interest rate is generally allowed unless the higher rate would produce inequitable result); In re Terry Ltd. P'ship, 27 F.3d 241, 243 (7th Cir.), cert. denied, 513 U.S. 948 (1994) ("What emerges from the post-Ron Pair decisions is a

---

[9] Because we have determined Entz-White is not applicable, we need not determine whether it remains good law, which the parties dispute.

-15-

presumption in favor of the [default] contract rate subject to rebuttal based upon equitable considerations."); Bradford v. Crozier (In re Laymon), 958 F.2d 72, 74 (5th Cir.), cert. denied, 506 U.S. 917 (1992); Equitable Life Assurance Soc'y v. Sublett (In re Sublett), 895 F.2d 1381 (11th Cir. 1990)). The Panel then held that the debtor had sufficiently shifted the burden to the lender when the lender's officer testified that one purpose of the default rate is to encourage timely payment — i.e., it was a penalty as opposed to compensating the lender for any demonstrated losses due to the default. Consequently, the Panel remanded for a determination of whether the default rate reasonably compensated the lender for actual loss. If so, then the bankruptcy court was free to award such interest. 256 B.R. at 925.

**C.    Future Media**

Finally, in Future Media, lender GECC loaned the debtor $10.5 million with a $5 million revolving line of credit, secured by a first priority security interest in substantially all of the debtor's assets. 547 F.3d at 958. The loan agreement provided for a pre-default interest rate of the Index Rate plus 1.5% per annum and a default rate of an additional 2% per annum. An event of default occurred and the loans began to bear interest at the default rate. After additional default events occurred, the debtor filed a chapter 11 bankruptcy case. Id.

Subsequently, the debtor needed cash to wind down its operations and prepare for a sale of its assets. GECC agreed to debtor's use of cash collateral, subject to a stipulation to which the creditors' committee objected. To stop the accrual of interest on GECC's unpaid claim, the parties agreed GECC would be

-16-

paid in full at the default interest rate and that any dispute about default interest would be resolved at a later date. The committee argued that GECC was only entitled to interest at the pre-default rate and that GECC should return the amount it had collected over that. The bankruptcy court, relying on Entz-White, agreed and ordered GECC to return the difference. Id. at 958-59.

On appeal, the Ninth Circuit reversed and remanded. Because the only dispute was what type of interest was due to GECC under § 506(b), the court determined that the two relevant issues on appeal were: (1) whether Entz-White applied; and (2) if it did not, how the bankruptcy court should evaluate the viability of the contractual default interest rate on remand. Id. at 959-60. Distinguishing Entz-White on its facts, the court determined that the bankruptcy court had erred in extending the per se rule from Entz-White to the case at bar. Id. at 960. The court found that "'[c]reditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code.'" Id. (quoting Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 549 U.S. 443, 450 (2007)). Such a "qualifying or contrary" provision of the Code was present in Entz-White — the ability to cure a default in a chapter 11 plan under § 1124(2)(A) — but was not present in the instant case — paying the oversecured creditor's claim in full through a § 363 asset sale. Id. In reviewing the Panel's decision in Casa Blanca Project Lenders, L.P. v. City Commerce Bank (In re Casa Blanca Project Lenders, L.P.), 196 B.R. 140 (9th Cir. BAP 1996), abrogated by Future Media Prods., Inc., 547 F.3d 956 (9th Cir.

-17-

2008), a similar asset sale case, the Ninth Circuit found that the Panel had improperly extended Entz-White by "transposing" the concept of "cure" from § 1124 and § 365 into § 363. Id. at 961. The court reasoned that in the context of an asset sale, there is no "cure" of events of default. Id.

Because Entz-White did not apply, the Future Media court instructed the bankruptcy court on remand to apply the "rule adopted by the majority of federal courts. That rule simply stated is: The bankruptcy court should apply a presumption of allowability for the contracted for default rate, 'provided that the rate is not unenforceable under applicable nonbankruptcy law.'" Id. (quoting 4 COLLIER ON BANKRUPTCY, ¶ 506.04[2][b][ii] (15th ed. 1996)). To reach its decision in favor of applying default interest under § 506(b), the court relied specifically on two circuit cases: the Fifth Circuit case, In re Laymon, and the Seventh Circuit case, In re Terry Limited Partnership. Id. The court declined GECC's invitation to create a bright-line rule that a default rate differential of 2% is reasonable. Id. at 962.

**D.    The bankruptcy court misapplied the law.**

Clearly then, Future Media allows oversecured creditors to recover pendency interest at the default rate, at least in some instances. First, the presumption of the contractual default rate applies only to those oversecured creditors whose claims to the higher interest rate are enforceable under nonbankruptcy law. Further, the court's reliance on Laymon and Terry limited the presumptive rule and gave bankruptcy courts discretion as to whether the default rate will be applied. Laymon and Terry expressly allowed bankruptcy courts to assess whether the higher

-18-

default rate was reasonable or otherwise equitable under the circumstances. See In re Laymon, 958 F.2d at 75 (allowing default rate interest depending on "the equities involved in [the] bankruptcy proceeding"); In re Terry Ltd. P'ship, 27 F.3d at 243 (presumption in favor of contractual default rate is "subject to rebuttal based on equitable considerations"). That is essentially the rule the Panel set forth in Hassen Imports and Casa Blanca. However, we recognize that to the extent these cases placed the burden on the creditor to establish that the default rate reasonably compensated the creditor for its loses arising from the default, Future Media has overruled those decisions and has shifted the burden to the debtor to demonstrate the rate's unreasonableness, or that it is not enforceable under nonbankruptcy law.

One could arguably interpret the rule favoring default interest set forth in Future Media as applying only to those cases involving an asset sale under § 363. Although that case did not involve a confirmed chapter 11 plan as did Entz-White, the real focus in Future Media was the fact that no "cure" under § 1124(2)(A) was being effected. Further, the court did not appear to limit its holding to § 363 asset sale cases, even though it did make the distinction between sale cases and cases involving a confirmed chapter 11 plan. We do not see any reason why Future Media would not apply in this case, where the plan does not provide for a cure.

Accordingly, the bankruptcy court was required to apply the presumptive rule that Wells Fargo was entitled to the default rate for its pendency interest, provided that such rate is not

-19-

unenforceable under Nevada law. Nothing suggests the bankruptcy court applied this rule. We decline Wells Fargo's invitation to make any findings as to what default rate may be appropriate in determining the pendency interest in this appeal.

However, the presumptive rule for default interest is also subject to rebuttal based on equitable considerations. The bankruptcy court made no such "equity" findings here, other than finding that denying default interest was "fair and equitable" under § 1129(b), which we have concluded was error. Contrary to Debtor's position, and for the reasons stated above, § 1129(b) is not the "qualifying or contrary provision" of the Code the Future Media court was referencing.

## VI. CONCLUSION

The bankruptcy court appears to have denied default interest on either the erroneous basis that even though no cure was effected in the Plan, Entz-White applied, or that it could deny such interest on the basis that the Plan allowing for the nondefault rate was fair and equitable under § 1129. Either way, the court applied an incorrect standard of law. It also did not articulate any findings as to the equitable considerations it applied, if any. Accordingly, we REVERSE and REMAND the Confirmation Order with respect to the bankruptcy court's denial of default interest so that it can apply the proper rule under Future Media and make the appropriate findings.