FILED

MAR 15 2018

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

NOT FOR PUBLICATION

### UNITED STATES BANKRUPTCY APPELLATE PANEL
### OF THE NINTH CIRCUIT

| | | |
|---|---|---|
| In re: | ) | BAP No. AZ-17-1216-LKuB |
| | ) | |
| EPICENTER PARTNERS L.L.C.; | ) | Bk. No. 2:16-bk-05493-MCW |
| GRAY MEYER FANNIN L.L.C., | ) | |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| EPICENTER PARTNERS, L.L.C.; | ) | |
| GRAY MEYER FANNIN L.L.C., | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | **M E M O R A N D U M**[*] |
| | ) | |
| CPF VASEO ASSOCIATION, LLC, | ) | |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |

Argued and Submitted on February 23, 2018
at Phoenix, Arizona

Filed - March 15, 2018

Appeal from the United States Bankruptcy Court
for the District of Arizona

Honorable Madeleine Carmel Wanslee, Bankruptcy Judge, Presiding

_____

Appearances:    Michael McGrath of Mesch, Clark & Rothschild, P.C.
                argued for Appellants; Todd A. Burgess of
                Polsinelli PC argued for Appellee.

_____

Before: LAFFERTY, KURTZ, and BRAND, Bankruptcy Judges.

---

[*]This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8024-1.

Beginning in 2009, Debtors and Ganymede Investments Limited ("Ganymede") entered into agreements regarding Ganymede's advancement of funds to Debtors' attorneys to cover litigation costs related to Debtors' claims against Northeast Phoenix Partners ("NPP") and Desert Ridge Community Association ("DRCA") with respect to real property in Phoenix, Arizona. Those agreements provided that Ganymede would be paid its payments and costs advanced plus 40 percent of any litigation recovery. In 2013, after Debtors had settled with DRCA and obtained a judgment against NPP, Debtors and Ganymede reached an agreement to resolve Debtors' obligation to Ganymede.

As part of the agreement, Debtors executed a promissory note for $50,713,000 ("Ganymede Note"), which provided for no interest until the maturity date of December 31, 2015, after which post-maturity interest would accrue at the rate of 35 percent. The Ganymede Note was secured by a deed of trust on Debtors' leasehold interest in real property that Debtors had obtained in satisfaction of its judgment against NPP. A separate agreement, referenced in the note, set forth a payment schedule whereby Debtors would receive a substantial discount if they paid the principal amount early. Debtors did not pay the Ganymede Note by the maturity date. In 2016 Ganymede commenced foreclosure proceedings and shortly thereafter sold the underlying obligation to Appellee CPF Vaseo Association L.L.C. ("CPF").

A few days later, Debtors filed for chapter 11[1] relief. CPF

---

[1]Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all
(continued...)

filed proofs of claim based on the Ganymede Note. Debtors objected to those claims, arguing that the principal amount of the claims was much less, that the $50,713,000 obligation set forth in the Ganymede Note reflected an impermissible penalty on the "true debt," and that the 35 percent post-maturity interest rate was an unenforceable default rate. The bankruptcy court overruled Debtors' objections based on its interpretation of the relevant agreements, and Debtors appealed. We AFFIRM.

**FACTS**

**A.    Events giving rise to the Ganymede debt**

In 2008, Debtors Epicenter Partners, L.L.C. and Gray Meyer Fannin, L.L.C. retained attorneys Simpson Thacher & Bartlett, LLP ("STB") to pursue certain claims and defend others on Debtor's behalf against NPP and DRCA relating to real property located in Phoenix. About six months into the litigation, STB informed Debtors that it would no longer represent Debtors unless they arranged a means to fund the ongoing costs and expenses of the litigation. Ganymede agreed to finance Debtors' litigation against NPP and DRCA.

On December 22, 2009, Debtors entered into a Forward Purchase Agreement with Ganymede ("2009 FPA"). Pursuant to the 2009 FPA, Ganymede paid STB $5,000,000 to continue the litigation against NPP and DRCA. In exchange, Ganymede was to be repaid the $5,000,000 advanced plus a contingent fee on proceeds collected

---

[1](...continued)
"Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

from the litigation ("Resolution Amount").

In May 2010, Debtors reached a settlement with DRCA for $6 million, and in October 2010, after a jury trial, Debtors were awarded a $110,658,800 judgment against NPP.

In January 2011, Debtors and Ganymede entered into a Restated and Amended Forward Purchase Agreement ("2011 FPA"). The 2011 FPA recites that Debtors are "sophisticated and experienced, represented by counsel and with full access to [their] own legal advice." Under the 2011 FPA, Ganymede paid STB an additional $500,000; in exchange, Debtors agreed to pay, by the "Expiration Date" (defined as December 31, 2011) a settlement amount in cash or defined non-cash assets having a value equal to the cash settlement amount. The 2011 FPA provided that the "Resolution Amount" (calculated on the litigation recovery) would not be determined until all non-cash assets were converted into cash. The parties later executed a supplement to the 2011 FPA ("2011 Supplement"), pursuant to which Ganymede paid STB another $175,000. The 2011 Supplement extended the Expiration Date to December 31, 2012 and amended the calculation of the Resolution Amount.

On May 31, 2012, Debtors and NPP entered into a global settlement for payment of the judgment, under which NPP assigned to Debtors its leasehold interest in 120 acres of land at Desert Ridge in Phoenix (the "Lease Parcel"),[2] Master Developer rights, and other non-cash assets. Upon reaching this settlement,

---

[2]Debtors initially acquired a lease parcel of 120 acres; 20 acres were subsequently assigned to a related entity, and four acres were sold, leaving 96 acres.

Ganymede demanded immediate cash payment of 40 percent of the verdict amount, and STB refused to continue representing Debtors unless Debtors and Ganymede settled their dispute.

From September 2012 through April 2013, Debtors, Ganymede, and STB executed agreements and instruments relating to Debtors' property interests at Desert Ridge and repayment of the debt owed Ganymede. In December 2012, Debtors and Ganymede signed an Outline of Terms ("Outline"), which included a provision that the total amount owing to Ganymede was $50,713,000 and a clause giving Ganymede a first priority lien on all of Debtors' property, including the Lease Parcel. The Outline provided that Debtors would pay STB an additional $2,956,703.66 and included similar provisions securing the payment of this amount. Under the Outline terms, the sums due Ganymede and STB would bear interest compounded monthly at 35 percent and 6 percent, respectively. The Outline also included a discount schedule to incentivize early payment.

In April 2013, Debtors and Ganymede executed several documents, including the Ganymede Note, a promissory note payable to STB for $2,956,703.66 ("STB Note"), deeds of trust securing the notes, a Subordination and Intercreditor Agreement between Debtors, Ganymede, and STB ("ICA"), and a Second Supplemental Agreement Relating to Restated and Amended Forward Purchase Agreement ("SSA"). Collectively, these documents memorialized the terms of the Outline and granted Ganymede and STB liens on the Lease Parcel and all of Debtors' personal property.

The Ganymede Note, dated April 22, 2013, is for $50,713,000 and provides for no interest until the "Maturity Date" (defined

-5-

in the SSA as December 31, 2015), at which time interest would accrue at the rate of 35 percent per annum. The Ganymede Note references the SSA. The SSA, which amends and supplements the 2011 FPA, recites: "The parties have agreed that the Resolution Amount owing from [Debtors] to [Ganymede] under the [2011 FPA], inclusive of all fees, costs and interest, as of September 30, 2012, was $50,713,000 ("Liquidated Sum")." This amount is again referenced in paragraph 3.1 of the SSA, which provides: "The parties hereby reconfirm and restate their agreement that the total amount owing under the [2011 FPA] as of September 30, 2012, and the total amount of the Liquidated Sum herein, is $50,713,000." Paragraph 3.3 of the SSA further provides that the Liquidated Sum is fixed and noncontingent and shall not be affected by any bankruptcy filing.

Attached as Exhibit A to the SSA is a discounted payment schedule showing the amounts required to satisfy the Liquidated Sum if paid earlier than the Maturity Date, divided into Tranche 1, Tranche 2, and Tranche 3 amounts which, when added together, result in the "Total Amount" required to satisfy the obligation if paid by a particular date. According to the discounted payment schedule, if paid by September 30, 2012, the Total Amount due would have been $15,500,000, and if paid by December 31, 2015, the Total Amount due would have been $37,612,000.

The SSA also provides, at paragraph 3.6, that Debtors' failure to pay the "Total Amount" by December 31, 2015 shall constitute an immediate default, in which case, "the Total Amount shall thereafter bear interest at the rate of 35% per annum,

compounded monthly, until paid."[3]

On September 26, 2013, Debtors and Ganymede executed a letter agreement that provided for the sale and release of a portion of the Lease Parcel with payment of the proceeds to Ganymede ("2013 Letter Agreement"). The 2013 Letter Agreement replaced the discount scheme table with a new Exhibit A-2 and a new Tranche 4 Amount to be included in the Total Amount. The new Discount Scheme Table again listed the Total Amount due on September 30, 2012 as $15,500,000, but reduced the Total Amount due on December 31, 2015 from $37,612,000 to $35,514,955.[4]

Debtors did not pay the Total Amount or the Liquidated Sum by December 31, 2015. On January 14, 2016, Ganymede filed a notice of trustee's sale pursuant to the 2013 Agreements. On March 23, 2016 and May 5, 2016, Ganymede sold and assigned its interest in the 2013 Agreements to Appellee CPF Vaseo Associates, LLC ("CPF").

**B.    Bankruptcy Events**

Debtors filed for chapter 11 relief on May 16, 2016, and the bankruptcy court ordered the cases jointly administered. On September 30, 2016, CPF filed identical proofs of claim in each case in the amount of $58,527,469.03, of which $54,853,149.17 was

---

[3]The provision in the SSA that in the event of default, the "Total Amount" ($37,612,000) would bear interest at 35 percent appears to conflict with the terms of the Ganymede Note, which implicitly provides that interest is to be calculated on the principal balance of the note.

[4]The 2013 Letter Agreement states that it will terminate if the closing of the sale does not occur before December 31, 2013. The record does not reflect whether or when the contemplated sale occurred.

attributable to the Ganymede Note, and $3,675,319.86 to the STB Note.[5]

Debtors filed identical objections to CPF's claims in each bankruptcy case. Debtors objected to the portion of CPF's claim attributable to the Ganymede Note, arguing that the total amount due on maturity was $35,514,955, based on Schedule A-2 to the 2013 Letter Agreement. Debtors also objected to allowance of postpetition default interest at the rate of 35 percent. CPF filed a response, and Debtors filed a reply. At hearing, the bankruptcy court requested supplemental briefing on the issue of whether the increase in the interest rate on the maturity date or the discounted payments were punitive.

The parties provided the supplemental briefing, and the bankruptcy court thereafter entered its oral ruling on the record and a minute entry overruling Debtors' objections. The bankruptcy court determined that the $50,713,000 Liquidated Sum was not a penalty because it was the negotiated amount the parties agreed was owed to Ganymede, and it bore a direct relationship to the amount owed. The court found that this conclusion was not affected by the fact that the Liquidated Sum was subject to a discounted payment scheme. The bankruptcy court also ruled that the 35 percent interest rate to be applied after the Maturity Date was not an impermissible default rate because the parties, who were sophisticated, had agreed that no interest would accrue before the Maturity Date, a period of several years.

---

[5]The portion of CPF's claims attributable to the STB Note is not at issue in this appeal.

-8-

The court concluded that the 35 percent rate was an agreed amount that was meant to compensate Ganymede for risking that Debtors would fail to pay. Finally, the court rejected Debtors' argument that CPF was not entitled to postpetition pendency interest, finding, based on its previous valuation of the Lease Parcel, that CPF was an oversecured creditor entitled to pendency interest and any fees and costs allowed by the notes. The bankruptcy court's Minute Entry provided:

> THE COURT PLACES ITS FINDINGS AND ORAL RULING ON THE RECORD. IT IS ORDERED OVERRULING THE DEBTORS' OBJECTION IN ITS ENTIRETY. IT IS FURTHER ORDERED THAT CPF VASEO IS ENTITLED TO POST PETITION INTEREST, FEES, AND COSTS AS ALLOWED BY THE NOTES AND AT THE RATE IDENTIFIED BY EACH OF THE INDIVIDUAL NOTES.

On June 29, 2017, Debtors filed a motion for clarification or reconsideration under Rules 9023 and 3008, asking the court to clarify whether the June 23 minute entry order was intended to be a final order given that the amounts of CPF's claims had not yet been determined ("Clarification Motion"). The bankruptcy court issued an order on July 10, 2017, stating that the court had not intended to determine the amounts, but rather

> the intent of the Court was to resolve the issues Debtors raised in their objections to the proofs of claim: the "true" principal amount owed under the Promissory Note, whether CPF Vaseo is entitled to post-maturity interest at the rate stated in the Note, and whether CPF is entitled to pendency (post-petition) interest, and, if so, whether it should be the contract rate, or some other amount. . . . As far as the Court is concerned, the issues raised by Debtors' objections have been finally decided.

Order Clarifying the Court's Previous Oral Ruling Concerning Debtors' Objection to Claims; and Order Granting Rule 54(b) Relief ("Clarifying Order"). The bankruptcy court also

-9-

determined that the issues decided by it in overruling Debtors' claim objections were final under Civil Rule 54(b), made an express finding that there was no just reason for delay, and directed entry of a final order.

Debtors timely appealed from the Clarifying Order.

## JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(B). Subject to our discussion below, we have jurisdiction under 28 U.S.C. § 158.

## ISSUES

Whether we have jurisdiction over this appeal.

Whether the bankruptcy court erred in overruling Debtors' objections to CPF's claim.

## STANDARDS OF REVIEW

We have an independent duty to determine whether we have jurisdiction over an appeal, and we review such jurisdictional questions de novo. Belli v. Temkin (In re Belli), 268 B.R. 851, 853–54 (9th Cir. BAP 2001).

Claims objection appeals can involve both legal and factual issues. We review the legal issues de novo and the factual issues for clear error. See Veal v. Am. Home Mortg. Servicing, Inc. (In re Veal), 450 B.R. 897, 918 (9th Cir. BAP 2011).

The bankruptcy court's interpretation of contract terms is subject to de novo review unless extrinsic evidence was introduced on issues such as intent, in which event the pertinent factual findings are reviewed for clear error. Captain Blythers, Inc. v. Thompson (In re Captain Blythers, Inc.), 311 B.R. 530, 534 (9th Cir. BAP 2004), aff'd, 182 F. App'x 708 (9th Cir. 2006).

-10-

**DISCUSSION**

**A.  We have jurisdiction over this appeal.**

CPF contends that we lack jurisdiction over this appeal, arguing that it was untimely because the notice of appeal was filed July 14, 2017, twenty-one days after entry of the court's minute entry order.  CPF acknowledges that Debtors filed the Clarification Motion within the appeal period, but argues that the motion did not constitute a tolling motion.  Rule 8002(b)(1) provides:

> If a party timely files in the bankruptcy court any of the following motions, the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion:
>
> (A) to amend or make additional findings under Rule 7052, whether or not granting the motion would alter the judgment;
>
> (B) to alter or amend the judgment under Rule 9023;
>
> (C) for a new trial under Rule 9023; or
>
> (D) for relief under Rule 9024 if the motion is filed within 14 days after the judgment is entered.

The court's minute entry order constituted a dispositive order for notice of appeal purposes because it (1) stated that it was an order; (2) was served on counsel; (3) was signed by the bankruptcy judge; and (4) was entered on the docket.  See Ingram v. ACandS, Inc., 977 F.2d 1332, 1338–39 (9th Cir. 1992).  The pertinent question, therefore, is whether the Motion for Clarification constituted a tolling motion.

A motion to clarify can toll the appeal period if it can be construed as a Civil Rule 59(e) motion.  Iascone ex rel. Iascone v. Conejo Valley Unified Sch. Dist., 15 F. App'x 401, 402-03 (9th

Cir. 2001). CPF argues, however, that the Motion for Clarification could not be construed as a motion under Civil Rule 59(e), applicable via Rule 9023, because, although Debtors cited Rule 9023, they did not request any substantive relief, ask the court to amend its findings, or to reconsider, alter, or amend the June 23 minute entry order.

CPF correctly points out that courts are to look at the substance of a motion rather than its name to determine whether it is a tolling motion. Sea Ranch Ass'n v. Cal. Coastal Zone Conservation Comm'ns, 537 F.2d 1058, 1061 (9th Cir. 1976). There is also authority to support the proposition that to constitute a motion under Civil Rule 59(e), the movant must seek substantive relief. See Miller v. Transamerican Press, Inc., 709 F.2d 524 (9th Cir. 1983) ("The history of Rule 59(e) shows that 'alter or amend' means a substantive change of mind by the court."). But other Ninth Circuit cases suggest a more flexible application of Civil Rule 59(e). For example, in Iascone, the order at issue granted the defendants' motion to dismiss but did not state whether the dismissal was on jurisdictional grounds or whether the dismissal was with prejudice. The Ninth Circuit Court of Appeals construed the plaintiffs' subsequent motion for clarification as one to alter or amend the judgment under Civil Rule 59(e), even though the plaintiffs had not invoked that rule. Iascone, 15 F. App'x at 402-03. Similarly, in Barry v. Bowen, 825 F.2d 1324, 1328 (9th Cir. 1987), the Court of Appeals construed a motion for clarification of an order disposing of summary judgment motions which asked whether further proceedings were to be conducted as a motion to alter or amend under Civil

-12-

Rule 59(e)).

As noted, the Motion for Clarification requested that the court clarify whether its ruling was intended to be final. Based on the foregoing authorities, the Motion for Clarification may fairly be construed as a motion to alter or amend the judgment under Rule 9023. Alternatively, the motion may be construed as one under Rule 9024. See Miller, 709 F.2d at 527 (a court's failure to memorialize part of its decision is a clerical error, and the power to correct clerical errors of omission derives from Civil Rule 60).

Accordingly, whether the Motion for Clarification is construed as one brought under Rule 9023 or 9024, it tolled the appeal period, and Debtors filed the notice of appeal within 14 days of entry of the Clarifying Order. We have jurisdiction over the appeal.

**B.    Applicable Law**

The 2011 FPA and the SSA both state that they are governed by the laws of England and provide for mandatory arbitration of disputes arising out of the agreements under the Arbitration Rules of the London Court of International Arbitration. The Ganymede Note and deed of trust, however, provide that they are governed by the laws of the State of Arizona. Although the parties did not address this issue in their briefs, at oral argument the parties appeared to agree that Arizona law applies to the issues in this appeal.

**C.    The bankruptcy court did not err in overruling Debtors' objections to CPF's claims.**

A proof of claim filed in bankruptcy is deemed allowed

-13-

unless a party in interest objects. § 502(a). A proof of claim executed and filed in accordance with the bankruptcy rules constitutes prima facie evidence of the validity and amount of the claim. Rule 3001(f). The objecting party must produce evidence tending to defeat the claim that is of a probative force equal to that of the creditor's proof of claim. Ashford v. Consol. Pioneer Mortg. (In re Consol. Pioneer Mortg.), 178 B.R. 222, 226 (9th Cir. BAP 1995), aff'd sub nom. In re Consol. Pioneer Mortg. Entities, 91 F.3d 151 (9th Cir. 1996). Here, the Debtors' objections did not require factual findings but turned on the interpretation of the agreements and related documents. We thus treat the issue as one of contract interpretation. Under Arizona law, a court interpreting a contract must apply a standard of reasonableness to contract language and construe the contract in its entirety and in such a way that every part is given effect. Goddard v. R.J. Reynolds Tobacco Co., 75 P.3d 1075, 1078 (Ariz. Ct. App. 2003).

Debtors contend that (1) the discount scheme operated as a disguised penalty that is unenforceable under Arizona law; and (2) the 35 percent interest rate provided for by the Ganymede note was an impermissible default rate.

### 1. The bankruptcy court correctly concluded that the principal amount of the debt to Ganymede was the "Liquidated Sum" amount of $50,713,000.

The bankruptcy court found that the "Resolution Amount" or "Liquidated Sum" of $50,713,000 owed as of September 30, 2012, as defined in paragraph 1.5 of the SSA, was the principal amount of the debt. The record supports the bankruptcy court's conclusion. The Outline, the Ganymede Note, and the SSA all state that the

-14-

negotiated principal amount due as of December 31, 2015 was $50,713,000. Moreover, as determined by the bankruptcy court, that amount bears a reasonable relationship to the amount Ganymede was owed. Debtors do not dispute that Ganymede was owed $2,775,000 in litigation costs advanced plus a contingency fee of 40 percent of the litigation recovery. Under the settlement with NPP, that recovery was the Leasehold Parcel, which was later valued by the bankruptcy court at $121,000,000. As pointed out by the bankruptcy court, the SSA changed the right to 40 percent of the Lease Parcel into a promise by the Debtors to pay a liquidated amount of $50,713,000, which is fixed, noncontingent, and secured by the Leasehold Parcel.

Debtors dispute the bankruptcy court's conclusion that the Liquidation Sum bore a direct relationship to the amount owed, arguing that this conclusion is not supported by the 2011 FPA. Under the 2011 FPA, conversion of non-cash assets was to take place before the Resolution Amount was determined, and the conversion did not occur before September 2012. According to Debtors, Ganymede agreed to a debt of $15,500,000 as of September 2012 rather than waiting an indeterminate amount of time to receive 40 percent of the net proceeds of the litigation. Debtors also contend that Ganymede never treated the Ganymede Note as the true debt and instead referred to the Total Amount in the discount table to determine what was owed.

These arguments are not persuasive. The bankruptcy court properly reached its conclusions based solely on the relevant agreements; no evidence was presented as to Ganymede's intent. Moreover, given that the debt was not paid before the Maturity

-15-

Date, it makes no sense to look to the discount table to determine the amount owed.

Debtors also point out that the total amounts on the discount table were not calculated by discounting from $50,713,000 but were built up from the sums of Tranches 1, 2, and, if necessary, 3 and 4. Debtors contend that the Total Amounts were "directly derived from the true debt of $15,500,000, agreed to by the parties as of September 30, 2012." But this argument is belied by the terms of the Outline, the Ganymede Note, and the SSA, which all state that the negotiated principal amount due as of December 31, 2015 was $50,713,000.

In summary, Debtors' assertion that the "true debt" was $15,500,000 is entirely implausible under the circumstances. Given the risks inherent in the litigation itself and in accepting non-cash assets in satisfaction of the debt, it is illogical to conclude that Ganymede would have been willing to accept less than a third of the amount owed if that amount were not paid in accordance with the discount schedule, as happened here.

**2. The bankruptcy court correctly determined that the discount scheme did not constitute an unenforceable penalty.**

Debtors contend that the discount scheme results in a disguised penalty that is unenforceable under Arizona law. To support this contention, Debtors note that Ariz. Rev. Stat. § 44-1201(A) limits the legal interest rate on indebtedness to ten percent per annum unless the parties contract for a different rate. Debtors then argue that because the interest rate cannot be calculated from the discount table, the interest rate is

-16-

limited to ten percent. Debtors characterize the discount scheme as punitive because the amounts to be paid bear no relation to anticipated losses caused by late payment. Debtors also point out that if they had paid the total amount due under the discount table attached to the 2013 Letter Agreement as of December 31, 2015, they could have paid $35,514,955 on the maturity date, whereas if they paid one day later, they would owe the full $50,713,000. They contend that the $12,563,924 increase in the amount due is an unenforceable penalty.

But Debtors cite no cases (nor have we found any) where a discount scheme such as the one at issue here constituted a penalty. Given that the parties agreed that the Liquidated Sum was $50,713,000, the discount scheme can only be interpreted as providing an incentive to reward Debtors for early payment and not a punishment for late payment. We agree with the bankruptcy court that the discount scheme was not an unenforceable penalty.

### 3. The bankruptcy court did not err in allowing 35 percent postpetition pendency interest.

Oversecured creditors are entitled to interest at the contractual rate so long as that rate is enforceable under nonbankruptcy law. Wells Fargo Bank, N.A. v. Beltway One Dev. Grp., LLC (In re Beltway One Devel. Grp., LLC), 547 B.R. 819, 830 (9th Cir. BAP 2016). Debtors do not dispute that CPF is an oversecured creditor entitled to postpetition pendency interest. They argue, however, that the 35 percent rate is an unreasonable rate that is unenforceable under Arizona law.

The bankruptcy court determined that the rate was not unreasonable because the contracting parties were sophisticated,

-17-

and because Ganymede had agreed not to charge interest for several years. The court found that the 35 percent rate was a reflection of the risk for nonpayment and was a negotiated rate that was meant to compensate Ganymede for that risk.[6] Debtors argue that these reasons are "immaterial" to the determination of whether the rate is reasonable but cite no authority in support of that argument. Debtors also argue that there was never any risk of nonpayment because the parties intended the payment to be made from sales and assignments of the Lease Parcel such that the note holder was protected by a large equity cushion. But Debtors presented no evidence to the bankruptcy court on this point, and the bankruptcy court made no such finding. Finally, Debtors argue that the bankruptcy court failed to evaluate equitable considerations as required under In re Beltway One Development Group, 547 B.R. at 830, but the bankruptcy court's ruling made clear that it took into account all of the facts and circumstances. We agree with the bankruptcy court's conclusion that, under the facts presented, including the uncertainty inherent in relying on the liquidation of non-cash assets to satisfy a debt, the 35 percent rate was reasonable.

## CONCLUSION

For the reasons explained above, we AFFIRM.

---

[6]The bankruptcy court also noted that, in arguing that the 35 percent rate was unreasonable, the Debtors were asking the court "to ignore the long somewhat tortured history between these parties[,] the original litigation financing agreement[,] . . . and the positive successful result of that litigation."